UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
GENERAL CAPITAL PARTNERS, LLC

                           Plaintiff,

              -v-

Liberty Ridge, LLC (f/k/a American Heritage
Communities/Liberty Village, LLC)

                           Defendant.
------------------------------------------------------------x

Index No.

**COMPLAINT**

07 CIV 4089

    Plaintiff, General Capital Partners, LLC ("GCP"), by and through its attorneys Arent Fox LLP, as and for its complaint against defendant Liberty Ridge, LLC ("Liberty Ridge") alleges as follows:

    1.    This is an action to recover the unpaid and overdue balance of $200,000 plus interest owed by Liberty Ridge to GCP for certain brokering services provided by GCP with respect to the project known as Liberty Village (hereinafter, the "Project"). Pursuant to various written and oral agreements, Liberty Ridge, f/k/a American Heritage Communities/Liberty Village, LLC, promised to pay $400,000 in total compensation to GCP for services rendered in connection with the advertisement, marketing, sale, and transfer of the Project. As of the date hereof, Liberty Ridge has only paid the initial $200,000 to GCP and has failed and refused to pay the remaining balance of $200,000 to which it is obligated. GCP, therefore, seeks an award of monetary damages in the amount of $200,000 plus interest and attorneys fees.

### THE PARTIES

    2.    GCP is a Colorado limited liability company with its principal place of business at 600 Seventeenth Street, Suite 2350 South, Denver, Colorado 80202.

    3.    Liberty Ridge is, upon information and belief, a Virginia limited liability

NYC/323245.8

company with its principal place of business at 1300 Mount Kemble Avenue, Morristown, New Jersey 07962.

4. Upon further information and belief, American Heritage Communities/Liberty Village, LLC ("AHC/LV") filed an amendment to its registration as a limited liability company with the Virginia State Corporation Commission changing its name to Liberty Ridge, LLC effective September 12, 2006. Therefore, as referred to herein, Liberty Ridge and AHC/LV are the same entity.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332 (a)(1).

6. Venue in this district is conferred by 28 U.S.C. §1391(a)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district (and arise from a federal bankruptcy court proceedings in the Southern District of New York). Further, the agreements in which AHC/LV agreed to pay GCP contain venue provisions which dictate that all disputes regarding such agreements be brought in this district.

## FACTUAL BACKGROUND

7. Plaintiff refers to and realleges each of the foregoing allegations in the Complaint as though more fully set forth herein.

**A.    The Parties**

8. On March 11, 2004 (the "Petition Date"), Liberty Village Associates Limited Partnership ("LVA"), the former owner of the Project, filed a voluntary petition for relief under Chapter 11.

9. LVA's general partner was Savoy Senior Housing Corporation ("Savoy"). Savoy owned a 1% interest in LVA. LVA's two limited partners were Savoy Liberty Village, LLC

("SLV"), a Delaware limited liability company and TRBC Ministries LLC ("TRBC Ministries"), a Virginia limited liability company. SLV and TRBC Ministries owned 89% and 10% of LVA, respectively.

10. Upon information and belief, at all relevant times, Rev. Jerry Falwell ("Falwell Sr.") and Jerry Falwell Jr. ("Falwell Jr.") held direct or indirect ownership interests in TRBC Ministries.

11. Upon information and belief, AHC/LV was formed for the purpose of acquiring the Project and certain equity interests in LVA.

12. Upon information and belief, the members of AHC/LV include American Heritage Communities, Inc. ("AHC"), Liberty University and TRBC Ministries, among others.

13. Upon information and belief, at all relevant times, Falwell Sr and Falwell Jr. held direct or indirect ownership interests in AHC/LV.

14. GCP is a specialized investment bank which advises companies, creditors, and buyers and sellers of assets in distressed markets for a broad array of industries and transactions.

15. GCP has extensive experience in facilitating specialized transactions including the advertising, marketing and sale of distressed debt and assets for clients who are in or who are considering Chapter 11 bankruptcy protection.

16. GCP was retained for the purposes of effectuating a transaction for the sale of the Project.

**B.    The Project**

17. LVA was created for the purpose of acquiring and developing the Project.

18. The Project was to be a full-service senior retirement community to be constructed on 140 acres of land on top of Liberty Mountain in Lynchburg, Virginia. LVA

planned to build 1,135 dwelling unites over a seven year period including 233 detached homes, 402 attached homes and 500 condominiums and apartments (collectively, the "Project").

19. Upon information and belief, the Project was created to service the followers of and those affiliated with Falwell Sr., Liberty University, and the Jerry Falwell Ministries.

20. Upon information and belief, TRBC Ministries, in which Falwell Sr. held a controlling interest, had a long-standing business relationship with Community National Bank (the "Bank"). As a result of this relationship, LVA was able to obtain financing for the Project from the Bank in the form of a secured promissory note (the "Bank Note"). The Bank Note was secured by the Project's real and personal property pursuant to a certain Credit Line Deed of Trust dated May 7, 2001.

21. A dispute between the Bank and LVA regarding when LVA's payments on the Bank Note were due and payable resulted in the Bank declaring LVA in default and accelerating all of the payment obligations under the Bank Note.

22. As a result, LVA sought bankruptcy protection to stave off foreclosure by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

C.  **Retention of GCP for Its Investment Banking Services**

23. On or about April 19, 2004, LVA signed a retention agreement with GCP to serve as LVA's exclusive agent with respect to the Project (the "Retention Agreement").

24. Pursuant to the Retention Agreement, GCP agreed to provide certain services for payment of a commission upon the successful sale or transfer of the Project. Those services included but were not limited to, inspecting and creating a program to market and advertise the Project for sale to interested third-parties and endeavoring to locate such parties. GCP was

further tasked with negotiating with and obtaining offers from interested parties and communicating such offers to LVA.

25. On or about April 20, 2004, LVA filed an Application for an Order Authorizing the Employment of GCP as Investment Bankers with the Bankruptcy Court (the "Retention Application") seeking authority for LVA to enter into the Retention Agreement.

26. The Bank, as LVA's first priority secured creditor, objected to the Retention Application on the basis that, *inter alia*, it did not consent to the payment of GCP's fees from its collateral.

27. Because LVA could not overcome the Bank's objection, LVA did not ultimately seek approval of the Retention Application. Therefore, LVA did not retain GCP.

28. Since LVA could not retain GCP under the Bankruptcy Code, Jacob Frydman ("Frydman"), Savoy's principal, retained GCP pursuant to a letter agreement to provide the same services anticipated to be provided to LVA under the Retention Agreement (the "Frydman Letter Agreement"). A true and correct copy of the Frydman Letter Agreement is attached as <u>Exhibit A</u>.

29. Pursuant to the Frydman Letter Agreement, GCP agreed to continue its marketing the Project to all interested parties. In return, Frydman agreed to compensate GCP upon the sale of the Project based on certain benchmarks from the sale price.

**D.    GCP's Marketing Efforts**

30. Upon it's retention, GCP collected the initial due diligence materials needed to draft a marketing memorandum. For the purpose of drafting the marketing memorandum, GCP gained a basic familiarity with LVA's history, the physical condition of the model homes and the dimensions of the surveyed property. GCP met with representatives of LVA at various times

throughout the course of its marketing efforts. GCP met with Thomas Brooks, the engineer for the Project, in approximately August, 2004. GCP also met with Falwell Sr. in April, 2004, to discuss his intentions for the Project.

31. GCP developed its own list of prospects that were specific to LVA's assets, and targeted approximately 481 real estate developers and senior housing builders around the country.

32. GCP spoke with every entity that signed a confidentiality agreement, twenty-nine (29) in total. GCP provided those entities with access to view the on-line due diligence materials and answered questions related to particular concerns about the Project, both from an asset standpoint and a transactional standpoint. GCP spent additional time and effort collecting and preparing specific due diligence materials requested by prospective purchasers.

33. GCP solicited AHC in 2004 as a party that would be interested in the Project. GCP received a confidentiality agreement from AHC on or about August 16 2004 (the "August Confidentiality Agreement"). A true and correct copy of the August Confidentiality Agreement is attached as <u>Exhibit B</u>.

34. After receipt of the August Confidentiality Agreement, GCP met with individuals from AHC at the Project for an on-site tour to review its status. GCP also provided AHC the due diligence materials that GCP had in its possession. AHC, as a senior housing developer, showed great interest in the Project.

35. On or about September 13, 2004, GCP received a letter of intent from AHC regarding acquisition of the assets of LVA including the Project. GCP received a revised letter of intent from AHC on October 14, 2004 (the "Letter of Intent"). A true and correct copy of the Letter of Intent is attached as <u>Exhibit C</u>.

36. On October 22, 2004, with the assistance of GCP, AHC entered into a second confidentiality agreement with Frydman that allowed AHC to speak with and negotiate a workout arrangement with the Bank, TRBC Ministries, and Falwell Sr. (the "October Confidentiality Agreement"). A true and correct copy of the October Confidentiality Agreement is attached as Exhibit D.

37. Over the course of 24 months, GCP consistently spoke with AHC representatives, LVA representatives and creditor representatives regarding a sale transaction involving the Project. GCP's primary role was acting as a liaison between AHC representatives and Frydman representatives to ensure a transaction was completed. GCP met with AHC representatives at least 5 times between introduction and the ultimate transfer of the Project.

E. **AHC Agrees to Purchase the Liberty Village Project and Pay GCP's Commission**

38. AHC memorialized the basic terms of its agreement to purchase the Project in the Letter of Intent. Pursuant to the Letter of Intent, AHC agreed to purchase the Project for cash and other consideration which included, *inter alia*, the AHC assumption of "all of the unsecured debt due from Seller to creditors, as well as all administrative claims, as set out in the bankruptcy filing."

39. AHC further agreed, in the Letter of Intent, to assume LVA's obligations under the Retention Agreement, Mr. Frydman's personal guaranty, and to be responsible for "[p]ayment of the sales commission due to General Capital Partners, LLC, as their fees in connection with this sale in the amount of $400,000 in cash at closing." See Exhibit C.

40. Upon information and belief, after the execution of the Letter of Intent and on or about March 2, 2005, AHC entered into an agreement with Falwell Jr., Liberty University, and TRBC Ministries to form AHC/LV.

41. On or about March 16, 2005, AHC/LV entered into two agreements evidencing their acquisition of the Project and certain equity interest in LVA: (1) a Transfer Agreement between AHC/LV and LVA effective on or about March 16, 2005 (the "Transfer Agreement") and (2) a Partnership Interest Purchase Agreement ("PIP Agreement") by and between AHC/LV, Savoy, and SLV effective on or about March 16, 2005. True and correct copies of the Transfer Agreement and the PIP Agreement are attached as <u>Exhibits E and F</u> respectively.

42. The Transfer Agreement transferred LVA's interest in the Project, including the real property and related assets, to AHC/LV subject to approval by the Bankruptcy Court.

43. Consistent with the language in AHC's letter of intent, AHC/LV agreed in Section 6.01 of the Transfer Agreement that it would "pay the fee due to the Broker for the transaction (not to exceed $400,000)" and that "[LVA] would have no liability or obligation for or any portion thereof."

44. GCP is defined in Section 6.01 of the Transfer Agreement as the sole Broker to the transaction.

45. Therefore, under Section 6.01 of the Transfer Agreement, AHC/LV agreed to assume LVA's and Mr. Frydman's obligation to pay GCP's commission.

46. Pursuant to the PIP Agreement, AHC/LV acquired the combined 90% equity interest in LVA held by Savoy and SLV for approximately $4,000,000.00.

47. Upon information and belief, AHC/LV did not acquire the remaining 10% interest held by TRBC Ministries because that interest was already held, directly or indirectly, by Falwell Sr. and/or Falwell Jr.

48. In Section 5.3 of the PIP Agreement, AHC/LV again agreed to pay GCP's commission with respect to services rendered in connection with its purchase of the Liberty

Village. Section 5.3 states as follows:

> No agent or broker retained by [LVA] or the Seller is entitled to any commission, finder's or similar fee in connection with the transactions contemplated by this Agreement and the [Transfer Agreement] except for General Capital Partners, LLC which will be entitled to a fee (the "Broker's fee") of not more than $400,000, payable upon closing. [AHC/LV] will be responsible for payment of such fee.

49. Further, in Section 2.2 of the PIP Agreement, AHC/LV agreed to release Frydman of his obligation to pay GCP's commission by "indemnif[ying] and agreeing to hold harmless [Frydman] from and against . . . any commissions or fees due and payable to General Capital Partners, LLC."

50. AHC guaranteed payment and performance of all of AHC/LV's obligations under the PIP Agreement.

51. GCP is a third party beneficiary of the Transfer Agreement and the PIP Agreement.

### F. Further Representations of AHC/LV's Agreement to Pay GCP's Commission

52. After execution of the Transfer Agreement and the PIP Agreement, AHC/LV once again acknowledged its agreement to pay GCP's commission during its negotiations with the Bank regarding satisfaction of the Bank Note.

53. On or about July 18, 2005, AHC and the Bank executed a letter summarizing the major terms by which AHC/LV had agreed to acquire the Project from LVA in the Chapter 11 Bankruptcy Proceeding (the "July 18 Letter").

54. In the July 18 Letter, AHC/LV acknowledged that it "shall be responsible for all costs of acquiring the Project and bringing it out of Bankruptcy including settlements with the unsecured creditors and the broker's commission to General Capital Partners LLC." A true and correct copy of the July 18 Letter is attached as Exhibit G.

NYC/323245.8                                            9

55. On or about October 5, 2005, LVA filed a Disclosure Statement for the First Plan of Liquidation of Debtor Liberty Village Limited Partnership ("Disclosure Statement") for approval by the Bankruptcy Court.

56. The Disclosure Statement provided, *inter alia*, information necessary to enable LVA's creditors to make an informed decision with respect to their acceptance or rejection of LVA's proposed plan of liquidation (the "Plan").

57. LVA's Plan provided for the transfer of the Project to AHC/LV free and clear of all liens claims and encumbrances thereof, except for a portion of the debt held by the Bank. As consideration for acquiring the Project, AHC/LV agreed, *inter alia*, to assume a substantial portion, if not all, of the obligations under the Bank Note and provide cash funds to pay certain professional fees.

58. The Disclosure Statement includes the following representation with respect to GCP's commission:

> [AHC/LV] has also agreed to pay the broker's commission not to exceed $400,000 to General Capital Partners, LLC . . . investment advisors who have been marketing the Project.

A true and correct copy of the Disclosure Statement is annexed as <u>Exhibit H</u>.

59. AHC/LV was on notice of the terms of the proposed Disclosure Statement and did not object thereto.

60. On October 12, 2005, the Bankruptcy Court entered an order approving the Disclosure Statement as containing adequate information under section 1125 of the Bankruptcy Code. A true and correct copy of the Order Approving the Disclosure Statement is annexed hereto as <u>Exhibit I</u>.

61. On March 6, 2006, the Bankruptcy Court entered an order confirming the Plan

(the "Confirmation Order"). The Confirmation Order, *inter alia*, approved the sale of the Project to AHC/LV. A true and correct copy of the Confirmation Order is attached as <u>Exhibit J</u>.

### G. <u>GCP Seeks Payment of Its Commission</u>

62. On or about July 5, 2006 GCP sent AHC/LV an invoice for its services in the amount of $400,000. Email from J. Gregory Barrow to Robert V. Gibbs dated July 5, 2006 is attached as <u>Exhibit K</u>.

63. AHC/LV did not object to the July 5 invoice. Rather, representatives of GCP and AHC/LV engaged in discussions regarding the timing and structure of payment of GCP's commission.

64. During negotiations, AHC/LV communicated to GCP that an accommodation was necessary to allow AHC/LV to conserve and use its available cash to fund certain activities for the Project, including but not limited to, obtaining a third-party marketing study.

65. As a result of such negotiations, GCP agreed to restructure payment of its $400,000 commission by agreeing to be paid $200,000 upon closing of the sale of the Project and the remaining $200,000 to be paid upon the obtaining by AHC/LV of additional, post-closing financing.

66. On or about July 11, 2006, GCP sent AHC/LV a revised invoice reflecting this agreement by stating that the amount of $200,000 was due on July 15, 2006, representing 50% of GCP's fee arising from the sale of the Project and that "the remaining 50% ($200,000) of the fee will be paid upon AHC/LV obtaining additional funding. This funding is expected to occur within 180 days" (the "July 11, 2006 Invoice"). A true and correct copy of the email dated July 11 email from J. Gregory Barrow to Robert V. Gibbs and Herb Kaiser attaching an invoice dated July 11, 2006 as <u>Exhibit L</u>.

67. As set forth in <u>Exhibit L</u>, by email dated July 12, 2006, GCP sent AHC/LV's counsel the revised invoice with the explanation as to GCP's agreement to receive its commission in two parts.

68. Neither AHC/LV nor their counsel objected or provide any comments with respect to GCP's revised invoice.

69. Indeed, the agreement to pay the GCP commission in two installments was further acknowledged by an email from Lucille Karp, Esq., counsel to AHC/LV on July 13, 2006, to Tyler Brown, Esq., counsel to the Bank, and copied to the principals of AHC/LV. A true and correct copy of the the email exchanges among Lucille Karp, Esq., Tyler Brown, Esq. and John M. Mercer, Esq., counsel to the Falwells, is attached as <u>Exhibit M</u>.

70. On or about July 17, 2006, the transfer of the Project from LVA to AHC/LV closed.

71. On or about that date, using the funding provided at closing, AHC/LV made the initial payment of $200,000 to GCP. A true and correct copy of the Borrower's Statement signed by AHC/LV at closing is attached as <u>Exhibit N</u>.

72. Upon information and belief, subsequent to closing on the Project, AHC/LV changed its name to Liberty Ridge.

73. Nearly five (5) months after closing, Liberty Ridge has failed to pay GCP the remaining $200,000 balance of their commission.

74. By letter date December 18, 2006, GCP requested payment of the remaining balance from Falwell Jr. A true and correct copy of the letter from J. Gregory Barrow to Jerry Falwell Jr. dated December 18, 2006 is attached as <u>Exhibit O</u>.

75. By letters dated December 20, 2006 and January 5, 2007, counsel for Liberty

Ridge, *inter alia*, denied any knowledge of amounts owing to GCP. Letters from A. Peter Brodell, Esq. dated December 20, 2006 and January 5, 2007 are attached as <u>Exhibit P</u>.

76. The remaining $200,000 owing to GCP remains unpaid as of the date hereof.

## COUNT I
## (BREACH OF CONTRACT)

77. Plaintiff repeats and realleges the allegations of paragraphs 1 to 76 as if fully set forth herein.

78. Frydman entered into the Letter Agreement by which Plaintiff was to receive a commission in connection with the marketing and sale of the Project.

79. Defendant assumed the express obligation to pay Plaintiff's commission of $400,000 in connection with Defendant's acquisition of the Project in (i) the Letter of Intent, (ii) the Transfer Agreement and (iii) the PIP Agreement.

80. Defendant's express promise to pay Plaintiff's commission of $400,000 as part of the purchase price for the transfer of the Project is further evidenced by representations made in the course of the bankruptcy proceedings and in Defendant's agreement with the Bank.

81. Defendant's agreement to pay Plaintiff's commission was further evidenced by a July 11, 2006 Invoice sent to Defendant requesting payment of $400,000 in two installments (the first payment due upon closing and the final payment due upon receipt of additional funding). Defendant responded to the invoice by remitting the initial payment of $200,000 on or about July 17, 2006.

82. Plaintiff has fully performed its obligations to provide investment banking services in connection with the Project and the transfer of the Project to Defendant was completed.

83. Defendant, however, has breached its agreement to pay Plaintiff's commission by

refusing to pay the remaining balance of $200,000 under the express terms of the parties' agreement.

84.    As a result of Defendant's breach, Plaintiff has been damaged in the amount of $200,000 plus interest and costs.

## COUNT II
## (ACCOUNT STATED)

85.    Plaintiff repeats and realleges the allegations of paragraphs 1 to 84 as if fully set forth herein.

86.    On July 11, 2006, Plaintiff presented a just and true account in the amount of $400,000 (with $200,000 due upon closing and $200,000 due upon receipt of additional funding) for services rendered in connection with the Project (the "Stated Account").

87.    This account was received by Defendant on or about July 11, 2006 and not disputed.

88.    To date, Defendant has paid only $200,000 against the Stated Account.

89.    By reason of the Stated Account, Defendant owes Plaintiff $200,000 plus interest, none of which has been paid, although demanded.

## COUNT III
## (QUANTUM MERUIT)

90.    Plaintiff repeats and realleges the allegations of paragraphs 1 to 89 as if fully set forth herein.

91.    Plaintiff conferred benefits on Defendant, including but not limited to, providing brokerage services in connection with the Project for which Plaintiff was not fully compensated.

92.    Because of the representations made by Defendant in the Transfer Agreement, the PIP Agreement, the Letter of Intent, and in the various representations made during the

bankruptcy proceedings, Plaintiff had a reasonable expectation to be paid by Defendant in the amount of $400,000 for the brokerage services rendered by Plaintiff.

93. Circumstances were such that Defendant knew or should have known that Plaintiff would expect to be compensated in the amount of $400,000 for its brokerage services. Defendant, however, has only paid $200,000 for Plaintiff's services.

94. Defendant has accepted, enjoyed and benefited from the Plaintiff's services.

95. Plaintiff has made repeated demands for the remaining balance due of $200,000 for the services rendered but Defendant has refused to remit payment.

96. Defendant should be made to pay the reasonable value of the services rendered by Plaintiff in an amount to be determined at trial but in no event less than $200,000 plus interest, costs, and attorneys' fees.

## COUNT IV
## (UNJUST ENRICHMENT)

97. Plaintiff repeats and realleges the allegations of paragraphs 1 to 96 as if fully set forth herein.

98. Plaintiff conferred benefits on Defendant, including but not limited to, providing brokerage services in connection with the Project for which Plaintiff was not fully compensated.

99. Without Plaintiff's expertise and brokerage services, Defendant would not have been able to consummate its deal to purchase the Project through the pending bankruptcy.

100. By consummating its purchase of the Project and agreeing to pay Plaintiff's commission as part of its purchase of the Project, Defendant voluntarily accepted and retained the benefits conferred by Plaintiff.

101. The circumstances were such that Defendant knew or should have known that Plaintiff would expect to be compensated in the amount of $400,000 for its brokerage services.

Defendant, however, has only paid $200,000 for GCP's services.

102. It would be inequitable for Plaintiff to retain the benefits provided without paying the full value thereof.

103. Defendant's unjust enrichment is an amount to be determined at trial, but not less than $200,000, plus interest, costs and attorneys' fees.

**WHEREFORE**, Plaintiff GCP demands judgment on its complaint against Defendant Liberty Ridge as follows:

a. An award of monetary damages in the amount of $200,000;

b. Pre-judgment interest;

c. Attorneys' fees, costs and disbursements of this action; and

d. Such other and further relief as this Court shall deem just and proper.

Dated: New York, New York
May 25, 2007

ARENT FOX LLP

By: *[signature]*
Christopher J. Giaimo (CJG 2260)
Aiesha L. Battle (ALB-1169)
1675 Broadway
New York, New York 10019
(212) 484-3900

*Attorneys for Plaintiff General Capital Partners LLC*