# EXHIBIT F

# PARTNERSHIP INTEREST PURCHASE AGREEMENT

By and Between

American Heritage Communities/Liberty Village, LLC ("Buyer")

and

Savoy Senior Housing Corporation ("GP")

and

Savoy Liberty Village, LLC ("LP")

(GP and LP are sometimes referred to collectively herein as "Seller")

## PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (the "Agreement") dated this 16th day of March, 2005 by and between American Heritage Communities/Liberty Village, LLC ("Buyer"), Savoy Senior Housing Corporation ("GP") and Savoy Liberty Village, LLC ("LP") (GP and LP are sometimes referred to collectively herein as "Seller").

### RECITALS

WHEREAS, the Seller owns ninety (90%) percent of all of the issued and outstanding partnership interests (GP owns the 1% General Partnership interest, and LP owns an 89% Limited Partnership interest, collectively the "Partnership Interests") of Liberty Village Associates Limited Partnership (which is hereafter referred to as the "Company");

WHEREAS, the GP has the right (the "Exclusivity Enforcement Rights"), independent of its position as the general partner of the Company, under Section 10.13 of the Company's Limited Partnership Agreement to prevent TRBC Ministries, LLC ("TRBC") from engaging in any business related to a Senior Housing Community located within 25 miles of Lynchburg, Virginia; and

WHEREAS, the Buyer simultaneously herewith is entering into an agreement with the Company (the "Company Agreement") pursuant to which, among other things, the Buyer is acquiring the real estate and improvements (the "Lynchburg Real Estate") currently owned by the Company in Campbell County, Virginia, and which is currently named Liberty Village; and

WHEREAS, the Buyer desires to engage in improving and developing a Senior Housing Community on the Lynchburg Real Estate in conjunction with TRBC; and

WHEREAS, the Buyer desires to obtain the GP's waiver (the "Waiver") of its Exclusivity Enforcement Rights in order to permit the foregoing to occur; and

WHEREAS, the GP is willing to provide the Waiver in consideration of the consideration set forth herein; and

WHEREAS, the GP and LP each desires to sell, assign and transfer all of the Partnership Interests to Buyer, all for the purchase price and other consideration set forth herein and Buyer wishes to purchase the Partnership Interests pursuant to the terms and conditions set forth below.

### AGREEMENTS

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties and covenants set forth herein, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE PRICE AND OTHER CONSIDERATION

Section 1.1 Purchase Price. The purchase price and the other consideration (the "Purchase Price") shall be as follows:

| | | |
|---|---|---|
| for the Waiver by the GP | $1,000,000.00 | (the "Waiver Consideration") |
| for the LP Partnership Interests | $2,000,000.00 | (the "LP Interest Purchase Price") |
| for the GP Partnership Interests | $1,000,000.00 | (the "GP Interest Purchase Price") |
| Total: | $4,000,000.00 | |

which shall be payable as further provided in this Agreement. The LP Interest Purchase Price and the GP Interest Purchase Price are referred to collectively herein as the "Second Payment."

Section 1.2. Escrowed Funds for Waiver Consideration. Simultaneously with the execution hereof, Buyer is depositing the sum of Ten Thousand ($10,000) Dollars with Todtman, Nachamie, Spizz & Johns, P.C, as escrow agent (the "Escrow Agent"), such amount to be held and disbursed by the Escrow Agent in accordance with this Agreement and the terms and conditions of an escrow agreement substantially in the form of Exhibit "A" attached hereto (the "Escrow Agreement"). Within Ninety (90) days of the execution of this Agreement, the Buyer shall deposit with the Escrow Agent an additional Two Hundred Forty Thousand ($240,000.00) Dollars. The total amount so deposited with the Escrow Agent is referred to as the "Escrowed Funds."

## ARTICLE II

## PRE-CLOSING COVENANTS

Section 2.1. Confirmation of Plan. Buyer shall use its best efforts to assist the Company to confirm a Plan of Reorganization (the "Plan") for the Company in the Liberty Village Associates Limited Partnership Chapter 11 case (the "Bankruptcy Proceeding") pending in the Southern District of New York under case No. 04-11627 (ALG) within one hundred twenty (120) days of the execution of this Agreement. The terms of such Plan shall include (i) the curing of all defaults on the Bank Debt (defined in Section 2.2), (ii) the payment of 100% of allowed claims of the Company to all other creditors to be determined in accordance with applicable bankruptcy law and (iii) payment to the equity holders of the Debtor in accordance with this Agreement (the "Required Provisions"). The Seller will use its best effort to challenge and/or object to any claims which should not be allowed or should be reduced. The Seller shall cause the Company to cooperate with the Buyer in the confirmation of such Plan (the "Confirmation"). The Buyer may vary any terms of the Plan with the consent of the Seller, which consent shall not be unreasonably withheld. Without limiting the reasons for which consent may reasonably withheld, the following are examples of good reasons to withhold consent: (a) if any of the terms of the Plan vary from the draft plan of reorganization attached

hereto as Exhibit "B" previously filed in the Bankruptcy Proceeding and are adverse to the GP, the LP or any of its shareholders, partners or members; and (b) if the Plan does not include the provisions for the benefit of creditors which are at least as beneficial to the creditors as the Required Provisions.

**Section 2.2. Removal of Guarantee of Jacob Frydman; Indemnification.** Buyer shall use its best efforts to secure the release of Jacob Frydman from his guaranty of the Company's debt to Community National Bank (the "Bank Debt"). Buyer hereby indemnifies and agrees to defend, protect and hold harmless Jacob Frydman from and against all liabilities, claims, damages, actions, suits, proceedings, demands, assessments, adjustments, penalties, losses, costs and expenses whatsoever (including court costs, reasonable attorneys' fees and expenses and expenses of investigation), whether equitable or legal, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extraordinary, patent or latent that arise as a result of or incident to the guaranty provided by him in connection with the Bank Debt (provided, however, that such indemnification obligation shall not arise until after the assertion by Jacob Frydman of all defenses against payment under the Bank Debt and the exhaustion of all his remedies with respect thereto), and any commissions or fees due and payable to General Capital Partners, LLC in connection with this Agreement or the Company Agreement.

**Section 2.3. Agreement With Company.** Simultaneously with the execution hereof, Buyer is entering the Company Agreement.

**Section 2.4. Material Defaults.** It shall be an Event of Default hereunder by the Buyer if the Buyer shall be in default under the Company Agreement and has not cured such default within the time periods set forth in the Company Agreement or if Buyer materially defaults under this Agreement, and such default is not cured within thirty (30) days following written notice to cure. In the case of an Event of Default by the Buyer, Seller may elect either to receive the entire amount of the Escrowed Funds, as liquidated damages and not as a penalty, or to pursue any other rights and remedies to which it may be entitled. If Seller elects not to take the Escrowed Funds as liquidated damages, then the Escrowed Funds shall nevertheless remain in escrow as security for any judgment that may be obtained by Seller. If Seller materially defaults under this Agreement, and such default is not cured within thirty (30) days following written notice to cure, then Buyer may elect either to (i) receive all of its deposit monies back and terminate this Agreement or (ii) pursue specific performance, such election to be made by written notice given to the Seller within ten (10) days following the end of the cure period.

**Section 2.5. Non-Circumvention/No Solicitation or Partnership Interest Transactions.**

(a) Buyer covenants and agrees that it shall not at any time, directly or indirectly, either by or for itself or through any subsidiary or affiliate, seek to acquire any interest in the Project or any debt ("Project Debt") secured by the property owned by the Company and that any interest in the Project or the Project Debt will only be acquired pursuant to a written agreement with the Company. This covenant shall not apply following the closing. If there is no closing, or if this Agreement terminates for any reason, then this covenant shall apply for a period of five (5) years from the date of execution of this Agreement. This covenant shall survive the termination of this

Agreement. In the event of any breach of this covenant Buyer shall pay to Seller upon demand the sum of Five Million ($5,000,000) Dollars, not as a penalty but as liquidated damages.

(b)     From and after the date of execution this Agreement by the parties, Sellers agree that they and there respective members, shareholders, advisors and investment bankers will not directly or indirectly, solicit, encourage or discuss a possible acquisition, sale or other disposition of Sellers' Partnership Interests. In the event of any breach of this covenant Seller shall pay to Buyer upon demand the sum of Five Million ($5,000,000) Dollars, not as a penalty but as liquidated damages. Breach of this covenant and payment of liquidated damages pursuant to this provision shall not cause a termination of this Agreement.

Section 2.6. Liquidated Damages. The sums set forth in Sections 2.4 and 2.5 as liquidated damages are agreed upon because in the event of the breaches for which such liquidated damages are set forth, the damages of the Seller or Buyer as applicable would be substantial and it would be difficult to ascertain the actual damages suffered by the Seller or Buyer as applicable, as a result thereof. Consequently, the Buyer and the Seller agree that the sums set forth are reasonable liquidated damages and are not a penalty.

ARTICLE III

CLOSING

Section 3.1. Time and Place of Closing. The Closing shall take place at the offices of the attorneys for the Company one hundred twenty (120) days from the date hereof or, if earlier, ten (10) days following Confirmation (the "Closing Date").

Section 3.2. Deliveries by the Seller at Closing. Subject to Section 3.4, at the Closing Seller shall:

(a)     deliver to Buyer instruments of transfer (the "Partnership Interest Transfer Documents") for the Partnership Interests to the Buyer, duly executed, including but not limited to authorizing resolutions of each Seller and the authorization of SLV Lynchburg, LLC consenting to the execution and consummation of this Agreement; provided, however, if Confirmation has not yet occurred, the Partnership Interest Transfer Documents shall be placed in escrow with the Escrow Agent.

(b)     deliver to Buyer the Waiver. The Waiver shall provide that it will be effective only if and when there has been a closing under the Company Agreement and Confirmation by the first anniversary of the execution of this Agreement.

Section 3.3. Deliveries by the Buyer at Closing. Subject to Section 3.4, at the Closing Buyer shall:

(a)     cause the Escrowed Funds to be delivered to the GP; and

(b) pay to the GP the difference between the Waiver Consideration and the amount of Escrowed Funds released to the GP, via wire transfer or any other reasonable means specified by the GP;

(c) deliver to the LP a note (the "LP Note") in form satisfactory to the LP evidencing its obligation to pay the LP Interest Purchase Price; and

(d) deliver to the GP a note (the "GP Note") in form satisfactory to the GP evidencing its obligation to pay the GP Interest Purchase Price

**Section 3.4. Escrow Pending Confirmation.** If Confirmation has not occurred by the Closing Date, then at the Closing the Partnership Interest Transfer Documents, the LP Note and the GP Note (the "Escrowed Documents") shall be delivered to the Escrow Agent to be held pursuant to the Escrow Agreement. If after the Closing Date Confirmation shall occur by the first anniversary of the execution of this Agreement, the Escrowed Documents shall be released to their intended recipients as described in Sections 3.2 and 3.3; however, if Confirmation does not occur by the first anniversary of the execution of this Agreement, then the Escrowed Documents shall be returned to the parties who delivered them as described in Sections 3.2 and 3.3 pursuant to the terms and provisions of the Escrow Agreement, and except as otherwise provide herein this Agreement shall terminate.

ARTICLE IV

POST-CLOSING COVENANTS

**Section 4.1. Payments of Second Payment.** The Second Payment shall be due and paid, $2,000,000.00 to the LP, and $1,000,000.00 to the GP, pro-rata among them, as follows:

Once (a) the "Bank Debt" has been paid in full; and (b) Buyer has recouped an amount equal to : (i) the cash invested by the Buyer in excess of any borrowings and debt of the Buyer, paid to confirm the Plan of Reorganization, (the "Buyer Equity") and a sum equal to an annual ten percent simple (non-compounded) return on said Buyer Equity until recouped (collectively, the Buyer Equity and the ten percent simple (non-compounded) return on said Buyer Equity until recouped are collectively referred to as the "Minimum Return," and the date on which the conditions in both (a) and (b) have been satisfied is referred to as the "Trigger Date") then Buyer shall pay to Seller one-third to the GP and two-thirds to the LP:

Within ten (10) days following the Trigger Date, a sum equal to "The Per Unit Dollar Amount" (as hereafter defined) per unit theretofore "Sold" (as hereafter defined) in the Project, hereafter defined; and

Thereafter, a sum equal to The Per Unit Dollar Amount per unit thereafter Sold in the Project, to be paid within ten (10) days following the date that each unit is

Sold.

The foregoing until the Second Payment is paid in full.

The Buyer Equity shall be computed at Plan Confirmation and set forth as an exhibit to the Notes evidencing the Second Payment. Buyer shall be deemed to have received the Minimum Return if it directly or indirectly receives money or property totaling the Minimum Return, through any means, including but not limited to distributions from the Company, proceeds from Sold units where proceeds are received by Buyer or any affiliate or subsidiary thereof, receipt of the proceeds of refinancings or other capital events, or receipt of the proceeds from sale of the Partnership Interests or any other interest in the Project.

So long as any amount remains due with respect to the Second Payment, Buyer shall provide the Seller with monthly reports describing all information reasonably requested by Seller that establishes the proper amounts and timing of payment of the Second Payment. Seller shall have the right from time to time to review and audit any of Buyer's books and records which are relevant to the determination of the amount and timing of payment of the Second Payment.

The following definitions apply:

(a) "Bank Debt" is defined in Section 2.2.

(b) "Sold" means a transaction resulting in which a unit in the Project is sold, rented, licensed, subject to a right to use, proprietary lease, use right as part of a Continuing Care Retirement Community; life right; estate of less than fee simple; insurance product as part of a life care community; security as part of a offering in a senior community, time share, or any similar or comparable means of granting a person the right to own, trade, deal with, live in, use, occupy, maintain and/or have any other rights to a unit.

(c) "The Per Unit Dollar Amount" means the greater of (i) Three Thousand Dollars ($3,000.00), or (ii) the dollar amount which results from dividing (x) the Second Payment by (y) the total number of units to be built and Sold within the Project.

(d) "Transfer" means any sale, lease, transfer or other disposition of a Unit. To "Transfer" means to cause or permit a Transfer to occur.

(e) "Units" or "unit(s)" means a dwelling unit within the Project.

(f) "Project" means the project to be developed by Buyer and/or its affiliates on the land currently owned by the Company in Campbell County, Virginia, and which is currently named Liberty Village.

Section 4.2. **Further Assurances.** At any time and from time to time after the Closing Date, upon the request of Buyer, Seller will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further documents, instruments or assurances, as may be necessary, desirable or proper to carry out the intent and accomplish the purposes of this Agreement including but not limited to the delivery of any plans, contracts, tax returns of the Company, computer systems or other data of the Company and any other operational information of the Company.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows:

Section 5.1. **Organization.** The Company is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware.

Section 5.2. **Capitalization.** The GP owns a one (1%) percent partnership interest in the Company and the LP owns an eighty-nine (89%) percent partnership interest in the Company. Ninety (90%) percent of all of the issued and outstanding partnership interests of the Company are owned by the Seller.

Section 5.3. **Absence of Broker.** No agent or broker retained by the Company or the Seller is entitled to any commission, finder's or similar fee in connection with the transactions contemplated by this Agreement and the Company Agreement except for General Capital Partners, LLC, which will be entitled to a fee (the "Broker's Fee") of not more than $400,000, payable upon closing. Buyer will be responsible for the payment of such fee.

Section 5.4 **Organization and Good Standing of the Sellers.** The GP is a corporation duly organized, validly existing and in good standing under the laws of the State of New York and the LP is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware. Each Seller has the requisite power and authority to (a) execute, deliver and perform its obligations under this Agreement and (b) consummate the transactions contemplated hereby and thereby.

Section 5.5 **Authorization.** The execution and delivery by Sellers of this Agreement, the performance by Sellers of their respective obligations hereunder and the consummation by Sellers of the transactions contemplated hereby have been duly authorized by all necessary corporate or company action, s the case may be. This Agreement constitutes the legal, valid and binding obligation of Sellers, enforceable against each of them in accordance with its terms.

Section 5.6 **Consent;Notice.** No consent, notice, approval, exemption or authorization is required to be obtained from, no notice is required to be given to, and no filing is required to be made with any person or entity (a) in order for this Agreement to constitute a

legal, valid and binding obligation of Sellers or to authorize or permit the consummation by Sellers of the transactions contemplated hereby or (b) under or pursuant to any permits, licenses, consents, authorizations or approvals held by or issued to Sellers by reason of this Agreement or the consummation of the transactions contemplated hereby.

**Section 5.7  Partnership Interests.**  The partnership Interests are being transferred free and clear of all liens and the Sellers represent that the Partnership Interests have not been pledged as security for any debts of either Seller or the Company.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents, warrants and covenants to Seller that:

**Section 6.1.  Corporate Organization.**  Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is a wholly owned subsidiary of American Heritage Communities, Inc.  Buyer has the requisite power and authority to (a) execute, deliver and perform its obligations under this Agreement and (b) consummate the transactions contemplated hereby and thereby.

**Section 6.2.  No Knowledge of Company or Seller Breach.**  Buyer has no knowledge of any indemnifiable breach by Company or Seller of any of their respective representations, warranties or covenants under this Agreement as of the date hereof.

**Section 6.3.  Absence of Broker.**  No agent or broker retained by the Buyer is entitled to any commission, finder's or similar fee in connection with the transactions contemplated by this Agreement.

**Section 6.4  Authorization.**  The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate or company action.  This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

**Section 6.5  Consent;Notice.**  No consent, notice, approval, exemption or authorization is required to be obtained from, no notice is required to be given to, and no filing is required to be made with any person or entity (a) in order for this Agreement to constitute a legal, valid and binding obligation of Buyer or to authorize or permit the consummation by Buyer of the transactions contemplated hereby or (b) under or pursuant to any permits, licenses, consents, authorizations or approvals held by or issued to Buyer by reason of this Agreement or the consummation of the transactions contemplated hereby.

## ARTICLE VII

## TAX MATTERS

**Section 7.1 Cooperation.** The Seller, the Company and the Buyer shall reasonably cooperate, and shall cause their respective representatives reasonably to cooperate, in preparing and filing all Tax Returns, including maintaining and making available to each other all records necessary in connection with the preparation and filing of Tax Returns, the payment of Taxes and the resolution of Tax audits and Tax deficiencies with respect to all taxable periods. The Buyer recognizes that the Seller will need access, from time to time, after the Closing, to certain accounting and Tax records and information held by the Company that pertain to events occurring prior to the date of Closing. The Buyer therefore agrees to cause the Company to allow the Seller and its representatives, at times and dates reasonably acceptable to the Buyer, to inspect, review and make copies of such records as the Seller and the Buyer deem necessary or appropriate, provided such activities are conducted during normal business hours on reasonable advance notice.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

**Section 8.1. Extension/Waiver.** Either the Seller or Buyer may extend the time for or waive the performance of any of the obligations of the other, waive any inaccuracies in the representations or warranties by the other, or waive compliance by the other with any of the covenants or conditions contained in this Agreement. Any such extension or waiver shall be in writing and signed by the Seller or by any officer of Buyer. No such waiver shall operate or be construed as a waiver of any subsequent act or omission of the parties hereto.

**Section 8.2. Notices.** All notices, disputes, consents, requests or other communications required or permitted hereunder shall be in writing and may be given by depositing the same in United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, by overnight courier or by delivering the same in person to such party.

(a) If to Seller, addressed to it at:
Savoy Senior Housing Corporation
111 Fulton St.
4th Floor
New York, NY 10038
Attn: Jacob Frydman

with a copy to:

Todtman, Nachamie, Spizz & Johns, P.C
425 Park Ave.
New York, NY 10022
Attn: Alex Spizz, Esq.


(b)     If to Buyer, addressed to it at:

American Heritage Communities, Inc.
14 Edgewood Road
Rumson, New Jersey 07760-1114
Attn: Herbert Kaiser

with a copy to:

McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
Attn: Edward Deutsch, Esq.

Notice shall be deemed given and effective the day personally delivered, the day after being sent by overnight courier, subject to signature verification, and three (3) business days after the deposit in the U.S. mail of a writing addressed as above and sent first class mail, certified, return receipt requested, or when actually received, if earlier. Any party may change the address for notice by notifying the other parties of such change in accordance with this Section 9.2.

**Section 8.3. Governing Law and Jurisdiction.** Any and all disputes concerning this Agreement, or concerning any obligations, responsibilities, or rights assumed by any Party to this Agreement, shall be governed by and construed in accordance with the laws of the State of New York. The Parties agree that if any dispute arises over the terms of this Agreement, that any action or proceeding shall be adjudicated in the federal or state courts located in the State of New York, New York County, which shall have jurisdiction over the parties hereto. Each of the Parties waives any claim of inconvenient forum with respect to the jurisdiction of such courts. The Parties agree that service of process may be made upon them by the other parties in the same manner as provided for the giving of notices. The Parties waive trial by jury.

**Section 8.4. Binding Effect.** This Agreement shall inure to the benefit of, and be binding on and enforceable against the heirs, legal representatives and assigns of the Seller and the successors and assigns of Buyer.

**Section 8.5. Entire Agreement.** This Agreement (including the Exhibits hereto) and the documents and schedules delivered pursuant hereto constitute the entire Agreement and

understanding between the parties, and supersedes any prior agreement and understandings relating to the subject matter hereof. This Agreement may be modified or amended by a written instrument executed by all parties hereto.

**Section 8.6. Severability of Provisions.** If at anytime subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

**Section 8.7. Execution in Counterparts.** This Agreement may be executed simultaneously in two or more counterparts and by facsimile, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

**Section 8.8. Attorney's Fees; Costs of Litigation.** If any legal action or any other proceeding is brought for the enforcement of this Agreement, or, because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys, fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

**Section 8.9. Headings.** The subject headings of the paragraphs and sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

**Section 8.10. Limitation of Rights to Parties.** Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors, legal representatives and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provisions give any third persons any rights of subrogation or action over or against any party to this Agreement. Notwithstanding the foregoing, Jacob Frydman is a third-party beneficiary of this Agreement.

**Section 8.11. Assignment; Binding Effect; Amendment.** This Agreement and the rights of the parties hereunder may not be assigned (except by operation of law) and shall be binding upon and shall inure to the benefit of the parties hereto, and the successors of Buyer, Company and Seller except that Buyer may assign its rights to a newly formed Virginia limited liability company that is wholly owned by American Heritage Communities, Inc. No such assignment shall relieve the Buyer of any of its obligations hereunder. This Agreement, upon execution and delivery, constitutes a valid and binding agreement of the parties hereto enforceable in accordance with its terms and may be modified or amended only by a written instrument executed by all parties hereto.

**Section 8.12. Expenses of Transaction.** Whether or not the transactions herein contemplated shall be consummated and except as otherwise provided in this or any other

agreement: (i) Buyer will pay the fees, expenses and disbursements of Buyer and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto and all other costs and expenses incurred in the performance and compliance with all conditions to be performed by Buyer under this Agreement; and (ii) Seller will pay the fees, expenses and disbursements of Seller and their respective agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto and all other costs and expenses incurred in the performance and compliance with all conditions to be performed by Seller under this Agreement.

**Section 8.13. No Waiver.** No delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of or in any similar breach or default occurring later; nor shall any waiver of any single breach or default be deemed a waiver of any other breach of default occurring before or after that waiver.

**Section 8.14. Survival of Representations and Warranties.** All of the representations, warranties of any party hereto contained in this Agreement and the liabilities and obligations of the parties with respect thereto shall survive the Closing for a period of one (1) year, except that Buyer's indemnification obligations set forth in Section 2.2 shall survive the Closing for so long as any obligation remains under the Bank Debt or to General Capital Partners, LLC.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

**BUYER**
American Heritage Communities/Liberty Village, LLC

By: _____
Name:
Title:

**GP**
Savoy Senior Housing Corporation

By: _____, President
Name:
Title:

**LP**
Savoy Liberty Village, LLC

By: Savoy Senior Housing Corp.

By: _____, Pres.
Name:
Title:

GUARANTEE:

American Heritage Communities, Inc. hereby guarantees payment and performance of all of Buyer's obligations under the within Agreement.

**American Heritage Communities, Inc.**

By: _/s/ [signature], Manager_
Name:
Title: