# EXHIBIT G

# American Heritage Communities

*Adding life to years...and years to life*[SM]

July 18, 2005

Mr. Worth Carter, Jr.
Bank Services of Virginia, Inc.
1300 Kings Mountain Boulevard
Martinsville, Virginia 24112

RE:    Liberty Village

Dear Worth:

The following is a summary of our understanding of the major terms agreed to by the parties at our June 10, 2005 meeting to discuss the restructure of the Community National Bank (the "Bank") funding of the Liberty Village Project (the "Project"). American Heritage Communities/Liberty Village, LLC, a Virginia limited liability company, ("AHC/LV") would acquire the Project including the real estate plus all improvements thereon, as well as all plans, permits and governmental approvals from Liberty Village Associates Limited Partnership the debtor (the "Debtor") in Chapter 11 bankruptcy proceedings (the "Bankruptcy").

The parties acknowledge that there are currently in place two agreements as respects the Project: a Transfer Agreement between the Debtor and an AHC/LV affiliate dated March 16, 2005, as well as, a Partnership Interest Purchase Agreement with the general partner and the 89 percent limited partner of the Debtor and the AHC/LV affiliate to purchase the partnership interests of the general partner and the 89 percent limited partner as well as the waiver of certain exclusivity enforcement rights of the general partner which agreement is also dated March 16, 2005 (collectively the "Agreements"). AHC/LV understands and agrees that a restructure of the transactions contemplated in the Agreements may be necessary in order to effectuate the following agreements with the Bank, including but not limited to the elimination of the up front payment of $1 million to the general partner of the Debtor currently called for in the Partnership Interest Purchase Agreement and the reduction of payment through settlement or otherwise of allowed claims to unsecured creditors. The renegotiation of provisions in the Partnership Interest Purchase Agreement shall not however, interfere with AHC/LV's right to acquire the general partner's and 89 percent limited partner's partnership interests. AHC/LV acknowledges and agrees that the Bank is not directing AHC/LV in how to renegotiate or restructure the Agreements to accomplish its objectives.

3 College Avenue, Suite 3    Frederick, MD 21701
Tel: 301 668 5665    Fax: 301 668 5666
Email: info@americanheritagecommunities.net

1.    CCRC Loans.

A.    CCRC and Assisted Living Units.  $10,881,000 ($13,000 per unit (837 CCRC and assisted living units)) of the debt to the Bank shall be secured by a first mortgage lien on the "CCRC land" and shall pay interest at the prime rate, as adjusted from time to time.  Principal and interest shall be paid currently except as otherwise outlined below.  Property shall be released from the lien of the mortgage on a per unit basis as the Bank loan is repaid with construction loan proceeds..  The repayment period shall be ten (10) years.

B.    Townhomes.  $1,012,500 ($22,500 per unit (45 townhome units)) of the debt to the Bank shall be secured by a first mortgage lien on the "Townhome Land" and shall accrue interest at the prime rate, as adjusted from time to time.  The Bank shall also provide a construction revolving line of credit facility upon terms to be determined.  Property shall be released from the lien of the mortgage on a per unit basis as units are sold.

C.    Sales Center.  $500,000 of the debt to the Bank shall be secured by a first mortgage lien on the sales center and shall pay interest at 6.25 percent with a fifteen (15) year amortization.  Principal and interest shall be paid monthly.

D.    Non-Recourse.  The CCRC Loans referenced above shall all be non-recourse debt to any entity other than ACH/LV; the Bank, however, will not release the current guarantors of the debt owed by the Debtor to the Bank from their obligations to the Bank.

E.    Accrual of Principal and Interest.  Payments of interest shall accrue for a six (6) month permit approval and marketing due diligence period with respect to the loans pertaining to the CCRC and Assisted Living Units during which time AHC/LV will make application for and obtain all necessary renewals and/or modifications of existing governmental approvals for the CCRC component of the Project at it sole cost and expense.

2.    Additional Bank Obligations.

A.    The Project shall be treated as having two distinct areas for further development, although no legal division of the Project into new parcels is contemplated for this purpose.  One area shall consist of the 837 units to be included in the CCRC, the 45 units that will comprise the Townhomes, and the Sales Center, and is referred to collectively herein as the "Retirement Area."  It shall be the obligation of AHC/LV to develop the Retirement Area.  The other area shall consist of the 218 single family homesites and is referred to herein as the "Single Family Area."  The Bank shall be responsible for having the Single Family Area developed in accordance with the site plans.  The existing stock of models, townhouses and other dwellings shall be moved from the Retirement Area to the Single Family Area at the sole cost and expense of the Bank and the proceeds from any associated sales shall belong to the Bank.

B.    The Bank shall use its good faith best efforts to reach a settlement with the couple currently living in the Retirement Area and move them to another unit in the

Single Family Area when built at the Bank's sole cost and expense. This may include the provision of temporary housing outside the Project property until such time as their unit is completed.

     C.    The Bank shall use its good faith best efforts to reach a settlement at its sole cost and expense with the existing residents in the single family homes such that the existing association is dissolved.

     D.    The Bank shall cooperate with AHC/LV with respect to its applications for all necessary approvals for the CCRC component of the Project.

3.    Additional AHC/LV Obligations.

     A.    AHC/LV shall be responsible for all costs of acquiring the Project and bringing it out of Bankruptcy including settlements with the unsecured creditors and the broker's commission to General Capital Partners, LLC.

     B.    AHC/LV shall be responsible at its sole cost and expense for the demolition of the partially completed three story apartment building in the Retirement Area.

     C.    While AHC shall have no responsibility for the development of the Single Family Area, it shall act as a sales agent, in conjunction with the marketing efforts to be performed with the assistance of TRBC, and shall receive a six (6) percent sales fee on single family homes as they are sold.

     D.    AHC/LV shall cooperate with the Bank with respect to any necessary approvals in connection with the Bank's efforts to have the Single Family Area developed. In addition, AHC/LV shall provide access to the Single Family Area across the Retirement Area and otherwise not interfere with the efforts to have the Single Family Area developed.

4.    Additional Conditions.

     A.    The existing guarantors of the debt to the Bank shall not be released from their guaranties and must acknowledge that the transactions outlined in this letter shall not be used as a defense to liability on the guaranties of the existing debt owed to the Bank. The existing guarantors, however, shall not be obligated to guarantee new advances made to AHC/LV, nor shall they be obligated on any advances made to assist in the development of the Single Family Area.

     B.    The lawsuits currently pending by and against the Bank, the Debtor, and the guarantors shall be stayed (or if required by the court, dismissed without prejudice), and shall not be reinstated unless there is a default under the new arrangements. Except as set forth in paragraph 4(A) above, all parties shall reserve all rights to assert the existing claims and defenses they have asserted in the lawsuits.

     C.    AHC/LV shall be liable to the Bank for the loans contemplated in paragraphs 1(A), (B) and (C) with respect to the Retirement Area, but shall not be

3 College Avenue, Suite 3    Frederick, MD 21701
Tel: 301 668 5665    Fax: 301 668 5666
Email: info@americanheritagecommunities.net

obligated with respect to the remaining balance of the debt owed to the Bank with respect to the Single Family Area.

      D.     The Bank shall continue to be protected against mechanic's and other liens through the existing or other acceptable title insurance.

      While many of the foregoing terms have to be developed in further detail, we feel that this memorializes our basic understanding of the major terms. If this letter accurately reflects your understanding of the major terms as well, we ask that you please sign where indicated and return a copy to me. Of course, all of the foregoing is non-binding until definitive agreements are entered into by the parties but we feel that this is the framework for such agreements. I look forward to hearing from you.

      Very truly yours,

      American Heritage Communities, Inc.

      By: *Bruce E. Boyer*
      Bruce E. Boyer
      Chairman of the Board of Directors

      Agreed.

      Community National Bank

      By: *Worth Harris Carter*
      Name: Worth Harris Carter, Jr.
      Title: Chairman of the Board & President
      Date: August 24, 2005

cc:   Robert V. Gibbs
      Tyler Brown, Esq.
      Robert Grossman, Esq.
      Jerry Falwell, Jr.
      Jacob Frydman
      Lucy Karp

# EXHIBIT H

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re                                    Chapter 11

LIBERTY VILLAGE ASSOCIATES               Case No. 04-11627-ALG
LIMITED PARTNERSHIP

    Debtor.

---

### DISCLOSURE STATEMENT FOR FIRST PLAN OF LIQUIDATION OF
### DEBTOR LIBERTY VILLAGE ASSOCIATES LIMITED PARTNERSHIP



ARENT FOX PLLC
Robert E. Grossman (RG-3602)
Beth Green Kibel (BG-1826)
1675 Broadway, 32nd Floor
New York, NY 10019
phone:  (212) 484-3900
fax:  (212) 484-3990

        Attorneys for the Debtor and Debtor-in-Possession

October 5, 2005

NYC/227222.5

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY ................................................................. 2
    A.   Introduction ............................................................................................. 2
II.  OVERVIEW OF THE PLAN ......................................................................... 3
    A.   General Summary of the Debtor's Current Ownership and the Plan .................... 3
    B.   Chapter 11 in General ............................................................................. 5
III. VOTING REQUIREMENTS AND PROCEDURES ............................................ 6
    A.   Notice To Certain Holders Of Claims ....................................................... 6
    B.   Parties In Interest Entitled to Vote ............................................................ 6
    C.   Acceptance of the Plan ............................................................................ 7
    D.   Voting Procedures, Ballots And Voting Deadline ...................................... 7
IV.  THE DEBTOR'S BUSINESS ......................................................................... 8
    A.   Events Leading to Chapter 11 Filing ......................................................... 8
V.   THE CHAPTER 11 CASE ............................................................................. 9
    A.   Operations During Chapter 11 .................................................................. 9
    B.   The Bank Litigation ................................................................................. 10
    C.   The Motions to Transfer Venue to Virginia ............................................... 12
    D.   Exclusivity ............................................................................................... 13
    E.   Removal of Actions ................................................................................. 13
    F.   The Bank's Motion for Relief from the Automatic Stay ............................. 13
    G.   The Best/L.T. Falwell Litigation .............................................................. 14
    H.   Claims Process and Bar Date ................................................................... 15
VI.  SUMMARY OF THE PLAN .......................................................................... 15
    A.   Introduction ............................................................................................. 15
    B.   Overall Structure of the Plan .................................................................... 16
    C.   Classification and Treatment of Claims ..................................................... 16
    D.   Payment of Administrative Claims and Priority Tax Claims. ....................... 16
    E.   Classification of Claims ........................................................................... 17
    F.   Classification and Treatment of Claims ..................................................... 17
    G.   Implementation Of The Plan .................................................................... 19
    H.   Treatment of Executory Contracts and Unexpired Leases .......................... 20

NYC/227222.5

# TABLE OF CONTENTS
### (continued)

Page

| | | | |
|---|---|---|---|
| | I. | Provisions Governing Distributions | 21 |
| | J. | Procedures For Treating Disputed, Contingent, And Unliquidated Claims or Distributions With Respect Thereto | 23 |
| | K. | Litigation Claims | 24 |
| | L. | Conditions Precedent To Confirmation and Consummation of the Plan | 24 |
| | M. | Summary of Other Provisions of the Plan | 25 |
| VII. | | CONFIRMATION | 28 |
| | A. | Confirmation Hearing And Deadline For Objections To Confirmation | 28 |
| | B. | Confirmation Requirements Generally | 29 |
| VIII. | | RETENTION OF JURISDICTION | 32 |
| IX. | | TAX CONSEQUENCES | 33 |

NYC/227222.5

# I.     INTRODUCTION AND SUMMARY

## A.     Introduction.

Liberty Village Associates Limited Partnership, the debtor and debtor-in possession in this case (the "Debtor"), submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, as the same may be further amended from time to time (the "Plan") proposed by the Debtor, in order to provide adequate information to enable holders of Claims and Interests to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.  The Debtor filed a Plan of Reorganization with the Bankruptcy Court on December 2, 2004.  This Plan of Liquidation supersedes the Plan of Reorganization that was filed on December 2, 2004.  All capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.

This Disclosure Statement sets forth certain information regarding the Debtor's assets, pre-petition history and significant events that occurred during the Debtor's chapter 11 case. This Disclosure Statement also describes the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with confirmation of the Plan and the manner in which distributions will be made under the Plan.  Finally, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims in the impaired Classes must follow for their votes to be counted.

This Disclosure Statement is intended to aid and supplement your review of the Plan. The information contained in this Disclosure Statement is provided for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan.  It summarizes and analyzes certain provisions of the Plan as well as documents and financial information on which the Plan is based.

Although every effort has been made to fully explain the various aspects of the Plan as it affects all parties in interests, this Disclosure Statement is not intended as a substitute for a careful review and analysis of the Plan by each Holder of a Claim or Interest entitled to vote thereon, but is intended to aid and supplement such review.  The description of the Plan herein is a summary only.  Holders of Claims and Interests and other parties in interest are cautioned to review the Plan for themselves for a full understanding of its provisions.  This Disclosure Statement is qualified in its entirety by reference to the Plan.

The Plan is proposed by the Debtor.  The Debtor believes that confirmation of the Plan will provide Creditors and Interest holders with the receipt of distributions on account of their Claims and Interests of a value in excess of what they might receive if the Plan is not confirmed and the case is dismissed or converted to one under Chapter 7 of the Bankruptcy Code.

## DISCLAIMER

ALL HOLDERS OF CLAIMS IN THE IMPAIRED CLASSES ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. EXCEPT AS OTHERWISE INDICATED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND NOT YET APPROVED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH ANY OTHER APPLICABLE LAW.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONSTRUCTIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

## II.    OVERVIEW OF THE PLAN

### A.    General Summary of the Debtor's Current Ownership and the Plan.

The Debtor is a Delaware limited partnership with its principal place of business and office located at 111 Fulton Street, New York, New York. The Debtor's general partner is Savoy Senior Housing Corporation ("Savoy"). Savoy owns a 1% interest in the Debtor. The Debtor has two limited partners, Savoy Liberty Village, LLC ("SLV"), a Delaware limited liability company and TRBC Ministries, LLC ("TRBC"), a Virginia limited liability company. SLV and TRBC own 89% and 10% of the Debtor, respectively.

The Debtor is a single-purpose entity that was formed to develop a full-service senior retirement community to be constructed on 140 acres on top of Candler's Mountain in Lynchburg, Virginia (the "Project"). The Project consisted of 1,135 dwelling units that were

scheduled to be built over a seven-year period. The Project was to include approximately 233 detached homes, 402 attached homes and 500 condominiums.

Pursuant to an agreement with between Debtor, Community National Bank (the "Bank"), and American Heritage Communities/ Liberty Village, LLC ("AHC"), AHC is acquiring the Project free and clear of all liens except the liens of the Bank. Accordingly, the Project (including the real estate plus all improvements thereon, as well as all plans, permits, and governmental approvals) shall be transferred to American Heritage Communities/ Liberty Village, LLC ("AHC"), free and clear of all liens (including the Mechanics' Liens) except the liens of the Bank, including the Bank Note (which may be modified by agreement between the Bank and AHC.)[1] In consideration for this acquisition, AHC has agreed to provide the money for the plan fund (the "Plan Fund") which shall consist of: (a) an amount equal to all court-approved Professional Fees, Administrative Claims, Priority Claims, and United States Trustee Fees that are owed through the date the Bankruptcy Case is closed, which amount shall be designated for payment of these fees and claims; and (b) an amount equal to either 20% of all Allowed Claims of Class 2 and Class 4 creditors or $1 million dollars, whichever is less, which amount shall be designated for payment to Class 2 and Class 4 creditors, and (c) the recovery from the Best/L.T. Falwell Litigation. (after a set-off is applied as described herein). AHC has also agreed to pay the broker's commission not to exceed $400,000 to General Capital Partners, LLC, the Debtor's investment advisors who have been marketing the Project. The Bank has agreed to vote in favor of the Plan if the Bank is able to reach an agreement with AHC regarding modification of the Bank Note.

The Plan is a liquidating Plan. In other words, the Debtor seeks to accomplish payments under the Plan by paying creditors out of the Plan Fund as described above. In addition, the Debtor shall continue to prosecute the adversary proceeding filed by the Debtor against the Best G.C., Inc. and Lewis T. Falwell, entitled *Liberty Village Associates Limited Partnership v. Best G.C., Inc. a/k/a Best Grading and Lewis T. Falwell*, pending in the United States Bankruptcy Court for the Southern District of New York as Case No.:04-4404 (ALG) (the "Best/L.T. Falwell Litigation") as described below. Any such recovery from the Best/L.T. Falwell Litigation will be applied as a set-off to the outstanding claims filed by the parties to the Best/L.T. Falwell Litigation. If any amount of the recovery in the Best/L.T. Falwell Litigation remains following the set-off described above, the remainder of the recovery in the Best/L.T. Falwell Litigation will be deposited into the Plan Fund for *pro rata* distribution to creditors pursuant to the terms of the Plan.

Claim and Interest holders in each Impaired Class of Claims or Interests are entitled to vote as a class to accept or reject the Plan. Class 1 (Claim of Community National Bank), Class 2 (Mechanic's Liens Claims), and Class 4 (General Unsecured Claims) are impaired under the Plan, and their votes will be solicited. Class 3 (Other Priority Claims Against the Debtor) is Unimpaired by the Plan. Under section 1126(f) of the Bankruptcy Code, such Claim holders are conclusively presumed to accept the Plan, and the votes of such Claim holders will not be solicited. Class 5 (Interests and Subordinated Claims) will be deemed to have voted against confirmation of the Plan. The Bank has agreed to vote in favor of the Plan if: (a) the Bank is

---

[1]       There will not be a true modification of the Bank Note but an assumption by AHC of part of the debt through three new notes.

able to reach an agreement with AHC regarding a modification of the Bank Note; (b) the Effective Date is conditioned on the Bank and AHC (signing definitive loan documents; and (c) the execution of the Standstill Agreement; and (d) the Debtor and the Guarantor shall remain liable to the Bank under the Bank Note, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

The Classes of Claims created under the Plan, the treatment of those Classes under the Plan, the means for implementation of the Plan, and the distributions to be made under the Plan are described in more detail below.

**B.    Chapter 11 in General**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. When a petition for reorganization under Chapter 11 is filed, an estate is created containing all of the debtor's property and, generally, the debtor remains in control of its property and business as a debtor-in-possession. The commencement of a case under the Bankruptcy Code triggers an automatic stay of all attempts to collect claims or enforce liens against a debtor or the property of a debtor that arose prior to the commencement of the debtor's case or that otherwise interfere with the debtor's property. Under Chapter 11, a debtor is authorized to reorganize its business and capital structure or propose an orderly liquidation of its assets for the benefit of its estate, creditors, and shareholders.

In general, a Chapter 11 plan of reorganization and/or liquidation divides claims and equity interests into separate classes, specifies the property, if any, that is to be distributed, to each class under the plan and contains other provisions necessary to the reorganization of the debtor. The Plan segregates the various Claims and Interests into different classes taking into account their different nature and priority. Confirmation of a plan of reorganization and/or liquidation is the principal objective of a Chapter 11 case.

A plan of reorganization and/or liquidation sets forth the means for treating claims against, and equity interests in, a debtor. A Chapter 11 plan may specify that with respect to certain classes of claims or interests, the plan does not alter the legal, equitable and contractual rights of the holders of claims or interests in those classes. These classes are referred to as unimpaired. The Bankruptcy Code conclusively presumes the acceptance of a plan by unimpaired classes and it is not necessary to solicit votes from the holders of claims or interests in these classes. A claim or interest is impaired under a plan of reorganization and/or liquidation if the plan provides that the legal, equitable, or contractual rights of the holder of the claim or interest are altered.

Except in certain instances, a holder of an impaired claim or interest is entitled to vote to accept or reject a plan of reorganization and/or liquidation. The Bankruptcy Code does not require every holder of claims and interests to vote in favor of a plan of reorganization and/or liquidation in order for the Bankruptcy Court to confirm -- or approve -- the plan; however, the Bankruptcy Court must find that the plan of reorganization and/or liquidation meets a number of statutory tests before it may be confirmed. Many of these tests are designed to protect the rights of holders of claims or equity interests who do not vote to accept the plan of reorganization

and/or liquidation but who will nonetheless be bound by the plan if it is confirmed by the Bankruptcy Court.

## III.    VOTING REQUIREMENTS AND PROCEDURES

### A.    <u>Notice To Certain Holders Of Claims</u>.

This Disclosure Statement is being transmitted to certain holders of Claims against the Debtor. As more fully described below under "Parties in Interest Entitled to Vote", under the Bankruptcy Code, only the votes of holders of claims in a class that is impaired and receiving distributions under the Plan are solicited. The purpose of this Disclosure Statement is to provide adequate information to enable any such holder to make a reasonably informed decision with respect to the Plan prior to exercising its right to vote to accept or to reject the Plan.

On _____ 2005, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail to enable the holders of Claims against the Debtor to make an informed judgment with respect to acceptance or rejection of the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY AND IN ITS ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan and developments concerning the Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained herein.

### B.    <u>Parties In Interest Entitled to Vote</u>.

In general, section 1124 of the Bankruptcy Code provides that a holder of an allowed claim or interest in a class that is "impaired" and that will receive some distribution under the plan may vote to accept or reject the plan. If the claim or interest is unimpaired, the Bankruptcy Code conclusively presumes such holder to have accepted the plan and the plan proponent need not solicit such holder's vote. If the holder of an impaired claim or interest will not receive any distribution under the plan in respect of such claim or interest, such holder is not asked to vote on the plan because the Bankruptcy Code deems such holder to have rejected the plan. Finally, a vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

A class of claims is deemed to be impaired under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof, or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Class 1 consists of the Claim of Community National Bank against the Debtor. Class 2 consists of all Mechanics' Lien Claims against the Debtor. Class 3 consists of all claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim. Class 4 consists of all General Unsecured Claims against the Debtor. Class 5 consists of all Interests and Subordinated Claims. Classes 1, 2, and 4 are impaired under the Plan and the Debtor is, therefore, soliciting the vote of the holders of the Claims in Classes 1, 2, and 4. Class 3 is unimpaired under the Plan and, therefore, the Debtor is not soliciting the votes of the holders of Claims in Class 3. Class 5 will not receive a distribution under the Plan. Accordingly, this Class will be deemed to have voted against confirmation of the Plan.

**C.    Acceptance of the Plan.**

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept a plan of reorganization and/or liquidation, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class that actually vote to accept or reject the plan.

**D.    Voting Procedures, Ballots And Voting Deadline.**

Accompanying this Disclosure Statement in the solicitation package being sent to holders of Claims in Classes 1, 2, and 4 are copies of the following: (i) the Plan; (ii) the notice of, among other things, the time for submitting ballots to accept or reject the Plan, the date, time and place of the hearing to consider confirmation of the Plan and related matters, and the time for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); and (iii) a ballot (and return envelope) to be used by the holders of impaired Claims in voting to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying the attached ballot, please indicate your acceptance or rejection of the Plan by indicating your vote on the Plan on the ballot. Please complete and sign your original ballot (copies will not be accepted), and return it as provided in the detailed instructions contained in the ballot.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, SIGNED AND RECEIVED NO LATER THAN _____, 2005 AT 4:00 P.M. EASTERN DAYLIGHT TIME (THE "VOTING DEADLINE"), BY THE DEBTOR'S ATTORNEYS, **ARENT FOX PLLC, 1675 BROADWAY, 32ND FLOOR, NEW YORK, NEW YORK 10019, ATTN.: BETH N. KIBEL, ESQ.**

## IV.    THE DEBTOR'S BUSINESS

### A.    Events Leading to Chapter 11 Filing

####    1.    The Circumstances.

As discussed above, the Debtor is a single-purpose entity formed to develop the Project.

Pursuant to an April 4, 2001 commitment letter for the Project, Community National Bank (the "Bank") committed to provide up to $20 million in funds to develop the Project. The loan closed on or about May 7, 2001. The commitment was structured as two separate lines of credit, one for infrastructure improvements, and a second, a revolving line for construction of the for sale and for rent units.

After January 16, 2003, the Debtor contends that the Bank improperly rejected its requests for funds, which prevented the Debtor from completing the Project and resulted in damages to the Debtor, including, but not limited to expenses and lost profits associated with the Project.

Had the Debtor been able to draw on the available lines of credit and obtain funding of the letters of credit (which the Bank refused to fund), the Debtor contends that it would have been able to generate in excess of $3.6 million in sales, which would have "primed the pump" and made the Project fully viable. If the Project were fully viable, the Debtor expected profits in the millions of dollars.

A year later, on or about January 16, 2004, counsel for the Bank notified the Debtor that the Bank, as holder of the Commercial Note and Addendum thereto dated May 7, 2001 (the "Note" or from time to time also referred to as the "Bank Note") had not received monthly interest payments for the period from January 1, 2003 through January 1, 2004, amounting to $972,779.63.

Counsel for the Bank further advised that unless the Bank were to receive payment of $972,779.63 on or before February 2, 2004, the Bank would declare all obligations under the Note immediately due and payable and exercise any and all rights and remedies under, inter alia, the Note, including presumably to foreclose on the Property securing the Note.

Consistent with course of dealings with the Bank and the language of the Note, the Debtor contends that it does not owe money to the Bank until the Note matures on June 1, 2006.

On or about February 3, 2004, counsel for the Bank advised the Debtor that the Bank, as holder of the Note, declared the Note to be in default, that the debt evidenced thereby was accelerated so that the obligations under the Note, including but not limited to the payment of the entire remaining principal balance, accrued interest and late charges, were immediately due and payable.

As a result of the Bank's action, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York on March 11, 2004 (the "Petition Date").

V.    THE CHAPTER 11 CASE

A.    <u>**Operations During Chapter 11**</u>.

    1.    <u>**The Court**</u>.

The Chapter 11 Case was filed in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York  10004-1004.  The Honorable Allan L. Gropper, United States Bankruptcy Judge, is presiding over the Chapter 11 Case.

    2.    <u>**Appointment of Professionals**</u>.

        (A)    <u>**The Debtor's Bankruptcy Counsel**</u>

On May 6, 2004, the Bankruptcy Court entered an Order authorizing the Debtor to employ and retain Arent Fox PLLC as its counsel, effective as of the Petition Date.

        (B)    <u>**No Other Professionals**</u>

The United States Trustee for the Southern District of New York (the "United States Trustee") has not appointed an Official Committee of Unsecured Creditors to serve in the Chapter 11 Case.  No other professionals have been retained in the Chapter 11 Case.

        (C)    <u>**The Application to Retain General Capital Partners, LLC**</u>

On April 19, 2004, the Debtor filed an Application for an Order Authorizing the Employment of General Capital Partners, LLC ("GCP") as Investment Bankers in order to market and sell the Project.  The Debtor and GCP agreed to calculate GCP's compensation based on the gross sale proceeds from the sale of the Project.  On May 11, 2004, the Bank filed an Objection to the Application, arguing, *inter alia*, that the Bank's secured claim will not be paid in full prior to the payment of any fees to GCP based on gross sale proceeds if such proceeds do not exceed the full amount of the Bank's secured claim.  The Debtor sought to resolve the Bank's objection, but the Bank was unwilling to agree to any compromise.

Even though the Bank, through its objection to the retention of GCP, stymied the Debtor's ability to retain professionals to market and sell the Project, it did not stop the Debtor from moving forward.  The President of the Debtor's corporate general partner put up his own money in order to ensure that the Property was marketed, for the benefit of the Debtor's creditors.

**B.**     **The Bank Litigation**

AHC, the Bank, and the Debtor have agreed that the Bank Litigation described below shall be stayed (or if required by the Court, dismissed without prejudice), and shall not be reinstated unless there is a default under the new agreements as described above reached between the parties.

**1.**     **The Debtor's Complaint**

On or about February 10, 2004, prior to the Petition Date, the Debtor commenced a lawsuit against the Bank and TRBC entitled *Liberty Village Associates Limited Partnership, by its General Partner Savoy Senior Housing Corporation v. Community National Bank and TRBC Ministries, LLC*, in the Supreme Court of the State of New York, County of New York (Index No. 04 CV-02310) (the "Bank Litigation").

On March 23, 2004, pursuant to Federal Rule of Bankruptcy Procedure 9027(a), and 28 U.S.C. § 1452(a), the Debtor filed papers to remove the Bank Litigation to the United States District Court for the Southern District of New York, for ultimate referral to the Bankruptcy Court. On April 2, 2004, the Bank Litigation was transferred to the Bankruptcy Court, where it is currently pending under Adversary Proceeding No. 04-2956 (ALG).

On June 15, 2004, the Debtor filed a Verified First Amended Complaint (the "Amended Complaint"). In the Amended Complaint, the Debtor has advanced four claims against the Bank and one claim against TRBC:

- In Count 1, the Debtor seeks a declaration that it is not obligated to pay the Bank any money under the express terms of the Note until June 1, 2006, and further, that the Bank is obligated to comply with the terms of the Note, as amended, to meet its obligations under the Note and to fund the lines of credit and fulfill outstanding letters of credit.

- In Count 2, the Debtor seeks a declaration that the Bank has breached the express terms and implied covenants of the Note by, *inter alia*, failing to extend money to the Debtor under two lines of credit with the Bank, and improperly exercising dominion and control over the Project.

- In Count 3, the Debtor seeks a declaration that the Bank negligently administered the lines of credit by *inter alia*, failing to extend money to the Debtor under two lines of credit with the Bank, and declaring the Debtor in default under the Note, accelerating the obligations under the Note, and threatening legal action under the Note.

- In Count 4, the Debtor seeks to equitably subordinate the Bank's claims to the claims of all other creditors.

- In Count 5, the Debtor seeks a declaration that, upon information and belief, TRBC breached the Debtor's Limited Partnership Agreement (the "Partnership

Agreement") by, *inter alia*, continuing to be involved in the development of the Project and to benefit financially from the Project to the exclusion and detriment of the Debtor and the other partners of the Debtor.

The Bank filed an answer to the Amended Complaint on June 28, 2004. In its answer, the Bank denied many of the allegations contained in the Amended Complaint, and asserted ten affirmative defenses. TRBC filed an answer to the Amended Complaint on July 7, 2004. In its answer, TRBC asserted three affirmative defenses.

The Bank Litigation will be dismissed and the parties shall not initiate litigation based on the claims raised in the Bank Litigation, except in accordance with the Standstill Agreement.

## 2.    **The Intervenor Complaint**

On January 25, 2005, Jacob Frydman, the President of the Debtors' general partner Savoy, and a guarantor of the loan transaction at issue in the Bank Litigation (the "Guarantor"), moved to intervene in the Bank Litigation and serve a complaint (the "Intervenor's Complaint"). The Bank opposed this motion. By Order entered on July 25, 2005, the Bankruptcy Court signed an Order permitting the Guarantor to intervene.

In his Intervenor's Complaint, the Guarantor advances six claims against the Bank:

- In Count I, the Guarantor seeks a declaration that his guaranty is rescinded, null and void, and of no force and effect due to mutual mistake regarding the appraisal.

- In Count II, the Guarantor seeks a declaration that his guaranty is rescinded, null and void, and of no force and effect due to the Bank's negligence in obtaining and accepting the appraisal, and/or failing to advise him of its misstatement of value.

- In Count III, the Guarantor seeks a declaration that the guaranty is rescinded, null and void, and of no force and effect, and that the Bank is liable to the Guarantor for damages because the Bank fraudulent induced him to guaranty the Bank's loan to the Debtor.

- In Count IV, the Guarantor seeks a declaration that the guaranty is rescinded, null and void, and of no force and effect, and that the Bank is liable for damages in an amount to be determined at trial, because the Guarantor was fraudulently induced into executing the guaranty in favor of the Bank.

- In Count V, the Guarantor seeks a declaration that he has no monetary obligation to the Bank under the Guaranty until June 1, 2006, because the Debtor has no monetary obligation to the Bank under the Note until June 1, 2006, and that the Bank is obligated to comply with the terms of the Commitment and Note, as amended.

- In Count VI, the Guarantor seeks a declaration that the Bank is liable to him for various breaches of contract and implied covenants of good faith and fair dealing.

The Bank Litigation, including the Intervenor Complaint, will be dismissed and the parties shall not initiate litigation based on the claims raised in the Bank Litigation except in accordance with the Standstill Agreement.

## C.    The Motions to Transfer Venue to Virginia

### 1.    The Motion of the Bank to Transfer the Chapter 11 Case

On April 14, 2004, the Bank filed a motion with the Bankruptcy Court to transfer the Chapter 11 Case to the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division (the "Venue Transfer Motion"). In the Venue Transfer Motion, the Bank argued, *inter alia*, that (i) the location of the Debtor's sole asset in Virginia weighed heavily in favor of transfer; (ii) the location of the Debtor's creditors favored transfer; (iii) the location of witnesses necessary to the administration of the estate favored transfer; (iv) Virginia's interest in adjudicating local controversies favored transfer; (v) the location of the Debtor's office in New York was not a sufficient reason to retain the Chapter 11 Case and the Bank Litigation in New York; and (vi) the economic and efficient administration of the estate favored transfer.

### 2.    The Motion of the Bank and TRBC to Transfer the Bank Litigation

Also on April 14, 2004, the Bank and TRBC filed a motion with the Bankruptcy Court to transfer the Bank Litigation to the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division (the "Bank Litigation Venue Transfer Motion"). In the Bank Litigation Venue Transfer Motion, the Bank and TRBC argued that because the Chapter 11 Case should be transferred to Virginia, and the Bank Litigation was only properly before the Court pursuant to the jurisdiction conferred by the Chapter 11 Case, the Court should also transfer the Bank Litigation to Virginia.

### 3.    The Debtor's Opposition to the Motions

On May 18, 2004, the Debtor filed a Memorandum of Law in Opposition to both venue transfer motions. In its opposition, the Debtor argued that venue in New York was proper, and the Bank did not meet its burden of proving that that the interests of justice or the convenience of the parties weighed in favor of transfer, because (i) the Debtor's principal place of business in New York weighed heavily against transferring venue to the Western District of Virginia; (ii) the economic administration of the Debtor's estate required the case to remain in the Southern District of New York; (iii) the proximity of witnesses necessary to the administration of the estate did not weigh in favor of transferring venue; (iv) the location of assets was insufficient to justify the transfer of the case; (v) the proximity of creditors did not weigh heavily enough to justify transfer of the case; and (vi) the need for potential ancillary administration of the estate should liquidation result did not favor transfer in the Chapter 11 Case.

The Debtor also argued that transfer of the Bank Litigation was not warranted because, *inter alia*, (i) the Bankruptcy Court could exercise personal jurisdiction over the Bank and TRBC; and (ii) the Bank's claim that jurisdictional issues will hinder administration of the estate if the case is not transferred is contrary to established law.

NYC/227222.5

12

4. **The Court's Decision Denying the Motions**

The Court held a hearing on the two motions on May 24, 2004. At the hearing, the Court found that, *inter alia*, that "the Debtor is endeavoring to protect its investment in good faith, and . . . the economic administration of the case would be better served by retaining the case here in New York." Accordingly, by two separate Orders dated May 28, 2004, the Court denied the Venue Transfer Motion and the Bank Litigation Venue Transfer Motion.

D. **Exclusivity**

Before its exclusive period to file a plan of reorganization expired, the Debtor made a motion before the Court, asking that the Court extend the exclusive periods during which the Debtor may alone file a Plan of Reorganization and solicit acceptances thereof for additional 120 days through and including November 6, 2004 and January 5, 2005, respectively, without prejudice to any further extensions. The Bank objected to this application arguing that the Debtor failed to establish the requisite "cause" warranting a 120-day extension of the exclusive periods. After a hearing, by Order dated August 25, 2004, the Court granted the Debtor's application.

On November 4, 2004, before its exclusive period to file a plan of reorganization expired, the Debtor made a second motion, asking that the Court extend the exclusive periods during which the Debtor may alone file the Plan and solicit acceptances thereof for additional 45 days through and including December 21, 2004 and February 21, 2005, respectively, without prejudice to any further extensions. The Bank filed an objection to this motion on December 6, 2004. A hearing on the motion was scheduled for December 8, 2004. However, on December 2, 2004, the Debtor filed a Plan of Reorganization and withdrew its motion.

E. **Removal of Actions**

On June 7, 2004, the Debtor filed an application asking the Court to enter an order extending the time within which the Debtor may file notices of removal for all pre-petition and post-petition actions for 120 days, through and including October 7, 2004. By Order dated July 1, 2004, the Court granted this Application. On September 22, 2004, the Debtor filed a second application asking the Court to further extend the time within which the Debtor may file notices of removal for all pre-petition and post-petition actions for an additional 120 days, through and including February 4, 2005. By Order dated October 6, 2004, the Court granted this Application.

F. **The Bank's Motion for Relief from the Automatic Stay**

On April 14, 2004, the Bank filed a Motion asking the Court for the entry of an order granting it relief from the automatic stay to permit it to continue with non-judicial foreclosure proceedings pending in Campbell County, Virginia, with respect to the Project (the "Stay Relief Motion"). By Stipulation dated April 22, 2004, the Debtor and the Bank agreed that the hearing on the Stay Relief Motion would be held in abeyance pending the Court's decision with respect to the Chapter 11 Venue Transfer Motion and the Bank Litigation Venue Transfer Motion. On October 25, 2004, the Bank renewed the Stay Relief Motion (the "Renewed Stay Relief

Motion"). In the Renewed Stay Relief Motion, the Bank argued that its security interest in the Project was not adequately protected. The Bank also argued that the Debtor lacked equity in the Project and had no prospects of reorganization.

The Debtor filed an objection to this motion on November 5, 2004, arguing that the Renewed Stay Relief Motion should be denied because the Bank failed to satisfy its burden in seeking such extraordinary relief. The Debtor argued, *inter alia*, (i) the Bank's Motion was contrary to the underpinnings of the automatic stay; (ii) the property had not diminished in value; (iii) the appraisal submitted by the Bank did not support lifting the stay; and (iv) the Bank failed to demonstrate that the property was not necessary to a reorganization.

The Bank filed a reply in further support of the Renewed Stay Relief Motion, arguing that the Debtor did not satisfy its burden of showing that the property is necessary for an effective reorganization.

The Renewed Stay Relief Motion was argued before the Court on November 8, 2004. On November 18, 2004, the Debtor and the Bank filed Proposed Findings of Fact and Conclusions of Law. On December 15, 2004, the Court issued a Memorandum Decision denying the Stay Relief Motion (the "Memorandum Decision").

In the Memorandum Decision, the Court found that the Debtor adequately established, for purposes of the Renewed Stay Relief Motion, that the property is essential to its reorganization and that a reorganization is reasonably in prospect. In addition, the Court found that the Bank "failed to provide hard evidence that deterioration [of the property] has occurred after the filing of the bankruptcy petition, or that the property is in danger of further material deterioration in the immediate future." On February 15, 2005, the Court signed an entered an order (the "Order") denying the Renewed Stay Relief Motion, provided that the Debtor paid or escrowed funds sufficient to cover delinquent post-petition real estate taxes were due and payable. The Debtor has since paid those real estate taxes. The Bank filed a Notice of Appeal from the Order on February 25, 2005. On April 18, 2005, the Bank withdrew its appeal.

## G.    The Best/L.T. Falwell Litigation

On October 22, 2004, the Debtor filed an Adversary Complaint against Best G.C., Inc. a/k/a Best Grading and Lewis T. Falwell (collectively, the "Defendants"). The Adversary Proceeding is entitled *Liberty Village Associates Limited Partnership v. Best G.C., Inc. a/k/a Best Grading and Lewis T. Falwell*, and is pending in the United States Bankruptcy Court for the Southern District of New York as Case No. 04-04404 (ALG) (the "Best/ L.T. Falwell Litigation").

In the Best/L.T. Falwell Litigation, the Debtor alleges that Best G.C., Inc. a/k/a Best Grading ("Best G.C."), the contractor who was hired to construct the Project, and its principal, L.T. Falwell, undertook work without permits in a reckless manner, resulting in numerous defaults in completing the site work. The Debtor has asserted a count for Breach of Contract against Best G.C. and L.T. Falwell (collectively, the "Defendants"), and seeks judgment against them in the amount of at least $42,633,949.

On December 27, 2004 the Defendants answered the complaint and denied many of the allegations in the complaint. The Defendants also asserted sixteen affirmative defenses and two counterclaims. In the first counterclaim, the Defendants seek to enforce their mechanic's lien. In the second counterclaim styled "breach of contract", the Defendants allege that the Debtor breached a written agreement for Best G.C. to provide site development improvements and to furnish materials, and seek judgment in the amount of $938,738.30, with interest.

On July 6, 2005, the Defendants filed a motion seeking leave to file a third-party complaint against entities and persons that they believe claim an interest in the Project.

In accordance with the Bankruptcy Rules, the Debtor intends to file a reply to the counterclaims, and also intends to file a reply to the Defendants' motion seeking leave to file a third-party complaint. An initial conference in this matter is scheduled to be heard on December 8, 2005.

**H.**     **Claims Process and Bar Date.**

**1.**     **Schedules and Statements.**

On April 26, 2004, the Debtor filed with the Bankruptcy Court, its statements of financial affairs, schedules of assets and liabilities, and schedules of executory contracts and unexpired leases.

**2.**     **Bar Date.**

In accordance with Bankruptcy Rule 3003(c)(3), the Bankruptcy Court established August 2, 2004 as the Bar Date by which Holders of Claims must file proofs of their Claims in the Chapter 11 Case. The Court also established September 7, 2004 as the Bar Date by which governmental units must file proofs of claim. Pursuant to Bankruptcy Rule 3003(c)(2), any Holder of a Claim whose Claim was not identified by the Debtor in its Schedules or is identified therein as disputed, contingent or unliquidated, and who failed to file a proof of claim on or before the Bar Date, may not be treated as a Holder of a Claim and shall receive no payment or other consideration under the Plan or otherwise.

Sixty-seven proofs of claims filed with the Court total approximately $27,195,758.88. This includes the proof of claim filed by the Bank in the approximate amount of $20,651,360.81

## VI.     SUMMARY OF THE PLAN

**A.**     **Introduction.**

This section of the Disclosure Statement provides a summary of the terms and provisions of the Plan, and the means for implementation of the Plan. This summary is qualified in its entirety by reference to the Plan, which is attached to this Disclosure Statement as **Exhibit A**. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms of the Plan or the documents referred to therein; reference is made to the Plan and to such documents for the full and complete statement of such terms.

The Debtor believes that through the Plan, Holders of Allowed Claims will obtain a greater recovery from the Debtor's estate than the recovery that would be available if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.

**B.    Overall Structure of the Plan.**

The Debtor seeks to accomplish payments under the Plan by placing monies provided to the Estate by AHC in a fund, from which creditors will be paid some of the amounts owed by the Debtor to each such creditor as explained in Section IIA of this Disclosure Statement, supra.  In addition, the Debtor shall continue to prosecute the Best/L.T. Falwell Litigation as described below.  Any such recovery from the Best/L.T. Falwell Litigation will be applied as a set-off to the outstanding claims filed by the parties to the Best/L.T. Falwell Litigation.  If any amount of the recovery in the Best/L.T. Falwell Litigation remains following the set-off described above, the remainder of the recovery in the Best/L.T. Falwell Litigation will be deposited into the Plan Fund for pro rata distribution to creditors pursuant to the terms of the Plan.

Claim and Interest holders in each Impaired Class of Claims or Interests are entitled to vote as a class to accept or reject the Plan.  Classes 1 (Claim of Community National Bank), 2 (Mechanics' Liens Claims), and 4 (General Unsecured Claims) are impaired, and their votes will be solicited with respect the Plan.  Class 3 (Other Priority Claims Against the Debtor) is Unimpaired by the Plan.  Under section 1126(f) of the Bankruptcy Code, such Claim holders are conclusively presumed to accept the Plan, and the votes of such Claim holders will not be solicited.  Class 5 (Interests and Subordinated Claims) will be deemed to have voted against confirmation of the Plan.  The Bank has agreed to vote in favor of the Plan if:  (a) the Bank is able to reach an agreement with AHC regarding a modification of the Bank Note; (b) the Effective Date is conditioned on the Bank and AHC signing definitive loan documents; (c) the Execution of the Standstill Agreement; and (d) the Debtor and the Guarantor shall remain liable to the Bank under the Bank Note, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

The Classes of Claims created under the Plan, the treatment of those Classes under the Plan, the means for implementation of the Plan, and the distributions to be made under the Plan are described below.

**C.    Classification and Treatment of Claims.**

Under the Plan, Claims against the Debtor are divided into different Classes.  Only Allowed Claims are entitled to receive distributions under the Plan.  The following is a description of the Plan's treatment of the Claims against the Debtor.

**D.    Payment of Administrative Claims and Priority Tax Claims.**

**1.    Administrative Claims.**

The Bankruptcy Code provides that certain types of claims which are entitled to priority in payment need not be classified.  Administrative Claims are not classified.  These Claims include all costs and expenses of administering the Debtor's Chapter 11 Case entitled to priority in payment in accordance with §§ 503(b) and 507(a)(1) of the Bankruptcy Code.  Administrative

expenses may include costs incurred in the operation of the Debtor's business from and after the commencement of the Chapter 11 Case, and the Fee Claims of Professionals who were retained by order of the Bankruptcy Court.

Each holder of an Administrative Claim shall be paid from the Plan Fund in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim Cash equal to the unpaid portion of such Administrative Claim.

### 2.     Priority Tax Claims

Each holder of a Priority Tax Claim shall be paid from the Plan Fund in full satisfaction, settlement, release, and discharge of such claim.

### 3.     Fees Owing Pursuant to 28 U.S.C. § 1930

All outstanding fees owing pursuant to 28 U.S.C. § 1930(a) due and owing as of the Confirmation Date shall be paid from the Plan Fund. After Confirmation, AHC shall pay such fees in full until a final decree is entered closing this case.

### E.     Classification of Claims.

### 1.     Summary.

The categories of Claims listed below classify Claims that are required to be designated in classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Classification of Claims in the Plan is for all purposes, including voting, confirmation and distribution pursuant to the Plan.

### F.     Classification and Treatment of Claims.

**1.** The Plan divides the remaining Claims against and Interests in the Debtor into various classes. The Classification of Claims and Interests against the Debtor pursuant to the Plan is as follows:

|  |  | Class | Status | Voting Rights |
|---|---|---|---|---|
| Class 1 | -- | Bank Claim | Impaired | entitled to vote |
| Class 2 | -- | Mechanics' Lien Claims | Impaired | entitled to vote |
| Class 3 | -- | Other Priority Claims | Unimpaired | not entitled to vote |
| Class 4 | -- | General Unsecured Claims | Impaired | entitled to vote |
| Class 5 | -- | Interests and Subordinated Claims | Impaired | not entitled to vote |

2.    **Classification and Treatment of Claims Against the Debtor.**

(A)    **Class 1:  Bank Claim**

(i)    *Classification*:  Class 1 consists of the claim filed by Community National Bank against the Debtor.

(ii)    *Treatment*:  The Debtor will transfer the Property to AHC, subject to the existing liens of the Bank, including the Note.  AHC will assume liability for the Note pursuant to a separate agreement that AHC shall reach with the Bank.  AHC is only assuming part of the obligations under the Bank Note, through three notes, and the Debtor and the Guarantor shall remain liable to the Bank under the Bank Note, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

(iii)    *Voting*:  Class 1 is impaired and Class 1 is entitled to vote to accept or reject the Plan.  However, the Bank has agreed to vote in favor of the Plan if: (a) the Bank is able to reach an agreement with AHC regarding a modification of the Bank Note; (b) the Effective Date is conditioned on the Bank and AHC signing definitive loan documents; (c) the execution of the Standstill Agreement; and (d) the Debtor and the Guarantor shall remain liable to the Bank under the Bank Note, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

(B)    **Class 2:  Mechanics' Liens Claims**.

(i)    *Classification*:  Class 2 consists of all Mechanics' Lien Claims against the Debtor.  These are claims secured by a Lien attaching by operation of law in favor of contractors or other persons.  Certain contractors and subcontractors who performed work on the Project filed mechanics' liens pre-petition against the Project.  The Debtor believes that many of these claims either are overstated or are invalid.  The Debtor intends to file numerous objections to Class 2 Claims.  The Project will be transferred to AHC free and clear of the Mechanics' Liens; all Mechanics' Lien Claims shall attach to the amounts designated for payment to Class 2 and Class 4 creditors in the Plan Fund.

(ii)    *Treatment*:  On, or as soon as reasonably practicable after, the latest of (i) the Distribution Date, (ii) the date such Claim becomes an Allowed Class 2 Claim, or (iii) the date such Class 2 Claim becomes payable pursuant to any agreement between the Debtor and the holder of such Class 2 Claim, each holder of any Allowed Class 2 Claim shall receive, its pro rata share of  Cash, from the Plan Fund, or (y) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

(iii)    *Voting*:  Class 2 is impaired and is entitled to vote to accept or reject the Plan..

(C)    **Class 3:  Other Priority Claims against the Debtor**

(i)     *Classification:*  Class 3 consists of all Other Priority Claims against the Debtor.  These are Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

(ii)     *Treatment:*  On the Confirmation Date, AHC shall pay each holder of an Other Priority Claim in full in satisfaction, settlement, release, and discharge of such claim.

(iii)     *Voting*:  Class 3 is not impaired and the holders of Allowed Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

**(D)**     *Class 4:  General Unsecured C*laims

(i)     *Classification*:  Class 4 consists of all General Unsecured Claims against the Debtor.

(ii)     *Treatment:*  On, or as soon as reasonably practicable after, the latest of (i) the Distribution Date, (ii) the date such Claim becomes an Allowed Class 4 Claim, or (iii) the date such Class 4 Claim becomes payable pursuant to any agreement between the Debtor and the holder of such Class 4 Claim, each holder of any Allowed Class 4 Claim shall receive, its pro rata share of Cash, from the Plan Fund, or (y) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

(iii)     *Voting*:  Class 4 is impaired and is entitled to vote to accept or reject the Plan.

**(E)     Class 5:  Interests and Subordinated Claims**.

(i)     *Classification*:  Class 5 consists of: (i)  all Interests, which are the equity interests in the Debtor held by SLV, TRBC Ministries, LLC, and Savoy; and (ii) all Subordinated Claims against the Debtor, which are claims held by "insiders" as defined in section 101(31) of the Bankruptcy Code.

(ii)     *Treatment*:  The holders of Class 5 Interests and Subordinated Claims against the Debtor shall not receive a distribution under the Plan.

(iii)     *Voting:*  Class 5 will be deemed to have voted against confirmation of the Plan.

**G.     Implementation Of The Plan**

**1.     Funding of the Plan on the Effective Date**.

AHC shall provide the money for the Plan Fund, which will be held by the Debtor in escrow for the purposes of and pursuant to the terms of the Plan.  As the consideration

for which AHC is providing the money for the Plan Fund, the Project shall be transferred to AHC subject to the Bank Note and the Bank Liens, and the retention of liability under the Bank Note by all parties who may be liable under the Bank Note including the Debtor and the Guarantor, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

The Debtor has authority to transfer the Project pursuant to this Plan, or in the alternative, pursuant to section 363 of the Bankruptcy Code, and the transfer is free and clear of all liens except the Bank's liens.

### 2.     Sources for Plan Distribution

All Cash necessary for the Debtor or the Disbursing Agent to make disbursements pursuant to the Plan shall be obtained from the Plan Fund.

### 3.     Distribution of Best/L.T. Falwell Recovery.

The Debtor shall continue to prosecute the Best/L.T. Falwell Litigation. Any Best/L.T. Falwell Litigation Recovery will be applied as a set-off to the outstanding Claims filed by the parties to the Best/L.T. Falwell Litigation. If any amount of the Best/L.T. Falwell Litigation Recovery remains following the set-off described above, the remainder of the Best/L.T. Falwell Litigation Recovery will be deposited into the Plan Fund for distribution pursuant to the terms of the Plan.

### 4.     Preservation of Rights of Action

Except as otherwise provided in the Plan, the Confirmation Order, or the Standstill Agreement, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall retain and may enforce, sue on, settle, or compromise all Litigation Claims that the Debtor or the Estate may hold against any Person or entity, including, but not limited to, the Best/L.T. Falwell Litigation.

## H.     Treatment of Executory Contracts and Unexpired Leases.

### 1.     Executory Contracts and Leases.

All executory contracts and unexpired leases to which the Debtor is a party are hereby rejected, except for an executory contract or unexpired lease that (a) has been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, or (b) is the subject of a separate motion filed under section 365 of the Bankruptcy Code by the Debtor prior to the Effective Date.

### 2.     Rejection Claims

In the event that the rejection of an executory contract or unexpired lease results in damages to the non-Debtor party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced filed by a proof of claim, shall be forever barred and shall not be enforceable against the Debtor, unless a proof of claim is filed with the Bankruptcy Court and

served upon counsel for the Debtor on or before the date that is thirty (30) days after the later of the Effective Date or the date of such rejection.

## I.    Provisions Governing Distributions.

### 1.    Distributions for Claims Allowed As Of the Effective Date.

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the Effective Date shall be made on the Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Section 4.3 of the Plan.

### 2.    Interest on Claims.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such disputed Claim becomes an Allowed Claim.  However, the Note will continue to carry interest for purposes of the Guarantor under the Note and AHC.  Nothing in the Plan shall release any claims of the Bank against Savoy, including claims for interest on such claims.

### 3.    Distributions By Disbursing Agent.

(A)    The Disbursing Agent shall make all distributions required under the Plan.

(B)    If the Disbursing Agent is an independent third party designated by the Debtor to serve in such capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Debtor on terms acceptable to the Debtor.  The Disbursing Agent shall be required to give a bond or surety for the performance of its duties.

### 4.    Means of Cash Payment.

Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by the payor and the payee, including by check or wire transfer, or, in the absence of an agreement, such commercially reasonable manner as the payor shall determine in its sole discretion.

### 5.    Delivery of Distributions

Distributions to holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtor have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, or (c) at the

addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts in respect of undeliverable distributions made by the Disbursing Agent, shall be returned to the Debtor until such distributions are claimed. All claims for undeliverable distributions made by the Disbursing Agent must be made on or before the first (1st) anniversary of the Effective Date, after which date all unclaimed property shall revert to the Debtor free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require the Debtor or the Disbursing Agent to locate any holder of an Allowed Claim.

### 6.    **Prepayment.**

Except as otherwise provided in the Plan or Confirmation Order, the Debtor shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time.

### 7.    **Fractional Dollars; De Minimus Distributions.**

Any other provision of the Plan notwithstanding, payments of fractions of dollars shall not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down). The Disbursing Agent shall not make any payment of less than fifty dollars ($50.00) with respect to any Claim unless a request therefore is made in writing to the Disbursing Agent.

### 8.    **Setoffs.**

The Debtor may, but shall not be required to, set off against any Claim not deemed an Allowed Claim under the Plan, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against the holder of such Claim.

### 9.    **Rights and Powers of Disbursing Agent.**

### (A)    **Powers of the Disbursing Agent.**

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, and (ii) make all distributions contemplated hereby.

### 10.    **Release.**

The Debtor, and its respective current or former members, partners, officers, directors, employees and agents (including any attorneys, financial advisors, and other professionals retained by such persons), and Affiliates, shall have no liability to any Holder of any Claim for

any act or omission in connection with, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and solely in the case of attorneys, to the extent exculpation would violate any applicable professional disciplinary rules including Disciplinary Rule 6-102 of the Code of Professional Conduct.

J.    **Procedures For Treating Disputed, Contingent, And Unliquidated Claims or Distributions With Respect Thereto**.

1.    **Prosecution of Objections to Claims**.

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline, which means the last day for filing objections to Disputed Claims, which day shall be ninety (90) days after the Effective Date, unless such date is extended by the Bankruptcy Court upon request by the Debtor.

If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been previously allowed. After the Confirmation Date, the Debtor will have the authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims. Except as provided below, from and after the Effective Date, the Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

2.    **Distributions After Allowance**.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, a distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution to which the Holder is entitled under the Plan.

3.    **Prosecution of Mechanics' Liens**

The Debtor will have the authority to investigate and file suits in the Bankruptcy Court challenging the validity of all Mechanics' Lien Claims. In addition, the Debtor will have the authority to settle, compromise, withdraw or litigate to judgment objections to all Mechanics' Liens Claims. The Project shall be transferred to AHC free and clear of the Mechanics' Liens; all Mechanics' Lien Claims shall attach to the amounts designated for payment to Class 2 and Class 4 creditors in the Plan Fund.

4.    **Treatment of Disputed Claims**

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claim, or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is disputed, until such Claim becomes an Allowed Claim.

**K.    Litigation Claims**

**1.    Prosecution of the Bank Litigation**

Upon the Effective Date, the Debtor shall dismiss with prejudice all claims against TRBC Ministries, LLC provided that prior to the Effective Date, TRBC Ministries, LLC provides the Debtor with releases releasing all claims now existing or which may exist at any time in the future, which TRBC Ministries, LLC withdraws the proof of claim that it filed in the Bankruptcy Case and may have against the Debtor, and its general and limited partners, and all of its officers, managers, and members. The Bank Litigation shall be dismissed without prejudice. The parties shall not initiate litigation on the claims made in the Bank Litigation except in accordance with the Standstill Agreement.

**2.    Prosecution of Best/L.T. Falwell Litigation**

The Debtor shall continue to prosecute the Best/L.T. Falwell Litigation.

**3.    Distribution of Proceeds from the Best/L.T. Falwell Litigation**

The Best/L.T. Falwell Litigation Recovery shall be distributed pursuant to the terms set forth *supra* in section Section G-4 of this Disclosure Statement.

**L.    Conditions Precedent To Confirmation and Consummation of the Plan**

**1.    Conditions to Confirmation.**

Typical of many reorganization plans, the Plan contains certain conditions to confirmation and consummation of the Plan. The Debtor expects that such conditions will be satisfied as contemplated. The Plan provides that it shall be consummated and the Effective Date shall occur if and only if the following conditions shall have occurred or shall have waived, if they are in fact waivable:

**(A)** the entry of a Final Order finding that this Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; and

**(B)** all provisions, terms and conditions of the Plan of Liquidation are approved in the Confirmation Order; and

**(C)** The Bank and AHC have signed the necessary definitive documents for the loan and the Standstill Agreement has been signed. These conditions shall be non-waivable.

**2.    Conditions to Effective Date**

Also typical of many reorganization plans, the Plan contains certain conditions precedent to the occurrence of the Effective Date. The Debtor expects that such conditions will be satisfied as contemplated. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing:

(A)     The Confirmation Order shall have been entered and become a Final Order, in form and substance reasonably satisfactory to the Debtor;

(B)     all Plan Exhibits shall be in form and substance reasonably acceptable to the Debtor, and shall have been executed and delivered by all parties' signatory thereto;

(C)     the Debtor shall be authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, leases, and the agreements or documents created in connection with the Plan;

(D)     the Project shall have been transferred to AHC; and

(E)     all actions, documents and agreements necessary to implement the Plan shall have been effected or executed;

### 3.    Waiver of Conditions

Except as set forth in Section L-1-C of this Disclosure Statement, each of the conditions set forth *supra* in Sections L-1 and L-2 of this Disclosure Statement may be waived in whole or in part by AHC, but only with the written consent of the Debtor. The Debtor may not unreasonably withhold its consent. The failure of a party to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time

## M.    Summary of Other Provisions of the Plan.

### 1.    Professional Fee Claims

All Professional Fee Claims in this Chapter 11 Case shall be paid from the Plan Fund.

### 2.    Administrative Claims Bar Date

All requests for payment of an Administrative Claim must be filed with the Bankruptcy Court and served on counsel for the Debtor no later than thirty (30) days after the Effective Date. Unless the Debtor objects to an Administrative Claim within forty-five (45) Business Days after receipt, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtor objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

All Administrative Claims in this Chapter 11 Case shall be paid from the Plan Fund.

3.    **Payment Of Statutory Fees**

All fees payable pursuant to section 1930 of Title 28 of the United States Code as of the Confirmation Date shall be paid from the Plan Fund and shall thereafter be paid by AHC in full until a final decree is entered closing this case.

4.    **Modifications and Amendments**

The Plan may be altered, amended or modified by the Debtor under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan and such proceedings do not materially adversely affect the treatment of holders of Claims under the Plan; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

5.    **Conflicts**

To the extent that any provision of the Disclosure Statement or the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflict with or are in any way inconsistent with the terms of the Plan, the Confirmation Order shall govern.

6.    **Successors And Assigns**

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

7.    **Compromises and Settlements After Confirmation**

After Confirmation, but prior to the Effective Date, pursuant to Fed. R. Bankr. P. 9019(a), the Debtor may compromise and settle various Claims against it and/or claims that it may have against other Persons. The Debtor expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against it and claims that it may have against other Persons up to and including the Effective Date.

8.    **Discharge Of The Debtor**

**Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waiver, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all**

Claims, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor; *provided, however,* that nothing in any section of this Plan shall effect a release in favor of any Person other than the Debtor with respect to any debt owed to the United States Government, any state, city, or municipality for any liability arising under (i) the Internal Revenue Code, or any state, city, or municipality tax code, (ii) the environmental laws of the United States, any state, city, or municipality or (iii) any criminal laws of the United States, any state, city, or municipality. All parties liable under the Note shall remain liable on the Note, and the Plan shall have no impact on the Guaranty or the Standstill Agreement. In addition, liabilities of Savoy, if any, to the Bank are not being discharged, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

9.    **Injunction**

(A)    Except as otherwise agreed to by the Debtor, AHC, and the Bank, or provided in the Plan or the Standstill Agreement, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold or may hold Claims against or Interests in the Debtor are permanently enjoined from taking any of the following actions against the Estate, or any of its property on account of any such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. However, all parties that may be liable under the Note shall remain liable under the Note, including the Debtor and the Guarantor, and Savoy is not being released from any claims of the Bank, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

(B)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in this Section.

10.    **Exculpation And Limitation Of Liability**

(A)    Except as otherwise provided in the Standstill Agreement, neither the Debtor, nor any of its respective present or former members, officers, directors, advisors, or attorneys shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of its respective agents, managers, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, formulating, negotiating or implementing the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the

Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. However, all parties who may be liable under the Note shall remain liable under the Note, including the Debtor and the Guarantor, and Savoy is not being released from any claims of the Bank, subject to any and all defenses now existing or which may arise in the future other than the transactions contemplated under the Debtor's Plan.

**(B)**    The foregoing exculpation and limitation on liability shall not, however, limit, abridge, or otherwise affect the rights, if any, of the Debtor to enforce, sue on, settle, or compromise the Litigation Claims retained pursuant to this Plan.

**(C)**    Nothing in this section shall (i) be construed to exculpate any entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, misuse of confidential information that causes damages, or *ultra vires* acts or (ii) limit the liability of the professionals of the Debtor to its clients pursuant to DR 6-102 of the Code of Professional Responsibility.

### 11.    Binding Effect

The Plan shall be binding upon and inure to the benefit of AHC, the Debtor, all present and former holders of Claims against and Interests in the Debtor, their respective successors and assigns, including, but not limited to, all parties-in-interest in this Chapter 11 Case.

### 12.    Effect of Non-Consummation

If either Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor or any other Person.

### 13.    Plan Exhibits

Any and all Plan Exhibits, or other lists or schedules not filed with the Plan shall be filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to date of the commencement of the Confirmation Hearing. Upon such filing, such documents may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any such document upon written request to counsel for the Debtor.

### 14.    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

## VII.    CONFIRMATION

### A.    Confirmation Hearing And Deadline For Objections To Confirmation.

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled a hearing on confirmation of the Plan for _____, 2005, at 10:00 a.m. (the "Confirmation Hearing"), before The Honorable Allan L. Gropper, United States Bankruptcy Judge, One Bowling Green, New York, New York 10004-1408. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for _____, 2005, Eastern Daylight Time.

### B.    Confirmation Requirements Generally.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) in the "best interests" of creditors and interest holders which are impaired under the plan.

#### 1.    Acceptance.

Classes 1, 2, and 4 are impaired, and accordingly their votes will be solicited with respect to this Plan. Class 3 is unimpaired under the Plan and is conclusively presumed to have accepted the Plan and is therefore not required to vote. Class 5 will be deemed to have voted against confirmation of the Plan. The Debtor reserves the right to seek nonconsensual confirmation of the Plan with respect to Classes 1, 2, and 4 if such Classes reject the Plan.

#### 2.    Unfair Discrimination and Fair and Equitable Tests.

The Bankruptcy Code requires that, as a condition to Confirmation, that each class of Claims or Interests that is impaired under the Plan accept the Plan, which the exception described below. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired' unless the plan (i) leaves unaltered the legal, equitable and contractual rights

to which the claim or interest entitles the holder of such claim or interest; or (ii) cures any default and reinstates the original terms of the obligation.

If any impaired Class of Claims or Interests does not accept the Plan as provided in §§ 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Proponents shall request that the Bankruptcy Court confirm the Plan in accordance with § 1129(b) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class, without including any acceptances by any insider. If certain impaired Classes reject the Plan, the Proponents reserve the rights to seek the application of the statutory requirements set forth in Section 1129(b) of the Bankruptcy Code for Confirmation of the Plan despite lack of acceptance by all impaired Classes.

Section 1129(b) of the Bankruptcy Code states that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that (a) (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (b) property subject to the liens of such impaired secured creditor is sold free and clear of such lien, with such lien attaching to the proceeds of the sale; or (c) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (b) if the class does not receive such amount, no class junior to the non-accepting class may receive a distribution or retain any property under the plan on account of their claim.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of interests includes the requirements that either: (a) the plan provides that each holder of an interest in such class receive or retain under the plan, on account of such interest, property of a value, as of the effective date of the plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) (a) the vale of such interest, or (b) if the class does not receive such amount, no class of interests junior to the non-accepting class may receive a distribution under the plan.

NYC/227222.5                                    30

The Debtor believes that the Plan and the treatment of Classes 1, 2 and 4 under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

3.    **Feasibility**.

Under section 1129(a)(11) of the Bankruptcy Code, the Debtor must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. Since the Plan provides for the liquidation of the Debtor, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtor will be able to satisfy the conditions precedent to the Effective Date and otherwise has sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Case.

The Debtor believes the Plan satisfies the financial feasibility requirements of the Bankruptcy Code. The Plan will be funded from monies contributed to the Estate by AHC, which will be placed in a fund, as described in section II, *supra*, from which creditors will be paid some of the amounts owed by the Debtor to each such creditor. In addition, the Debtor shall continue to prosecute the Best/L.T. Falwell Litigation as described herein. Any such recovery from the Best/L.T. Falwell Litigation will be applied as a set-off to the outstanding claims filed by the parties to the Best/L.T. Falwell Litigation. If any amount of the recovery in the Best/L.T. Falwell Litigation remains following the set-off described above, the remainder of the recovery in the Best/L.T. Falwell Litigation will be deposited into the Plan Fund for *pro rata* distribution to creditors pursuant to the terms of the Plan.

4.    **Best Interests Test and Liquidation Analysis**.

Notwithstanding acceptance of the Plan by each impaired class, to confirm a plan the Bankruptcy Court must determine that the plan is in the best interests of each holder of an impaired claim or interest that has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the "best interests" test of § 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find that the plan provides to each holder of such claim or interest a recovery on account thereof that has a value at least equal to the amount that the holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To estimate the recovery of an impaired holder of a claim or interest under a Chapter 7 liquidation, the Bankruptcy Court first determines the aggregate dollar amount that would be available if the Chapter 11 Case were converted to a Chapter 7 case and the assets of the debtor liquidated by a Chapter 7 trustee ("Liquidation Value"). The Liquidation Value available for payment of claims to impaired classes would consist of the net proceeds of the disposition of the debtor's assets augmented by cash held by the debtor, reduced by the additional costs and expenses of liquidation under Chapter 7 of the Bankruptcy Code and administrative claims which do not arise in a Chapter 11 reorganization case. These include, *inter alia*,: (a) the compensation of a Chapter 7 trustee and compensation for services rendered and reimbursement of disbursements incurred on behalf of the trustee's counsel and other professionals, (b) asset disposition expenses, (c) all unpaid expenses incurred by the debtor during the administration of the Chapter 11 Case, such as compensation for services rendered and reimbursement of

disbursements incurred by authorized professionals for the debtor, and (d) litigation costs. The liquidation itself would trigger certain priority claims and could accelerate other priority payments which would otherwise be payable in the ordinary course of a debtor's business. These priority claims must be paid in full out of liquidation proceeds before the balance is made available to pay other claims or make any distribution in respect of equity interests in a debtor.

If the Debtor did not go forward and transfer the Project to AHC, subject to the Bank Note, in exchange for AHC's contribution of monies to the Estate, the Debtor believes that no creditors would receive any distribution, because a forced sale of a project of undeveloped land would not net $20 million dollars and, accordingly, after the Bank was paid, no creditors would receive any distribution.

Accordingly, the Debtor believes that under the Plan each holder of Impaired Claims and Interests is receiving value greater than or at least equal to the value, as of the Effective Date, of the distribution that each such Holder would receive were the Debtor liquidated under Chapter 7 of the Bankruptcy Code.

## VIII.   RETENTION OF JURISDICTION

The Plan provides that following the Confirmation Date, the Bankruptcy Court will retain jurisdiction of the Chapter 11 Case for the following purposes:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise allowed under the Plan, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance or priority of Claims or Interests, and the resolution of any challenges to alleged Mechanics' Liens.

2.      hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; *provided, however,* that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

3.      hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom.

4.      effectuate performance of and payments under the provisions of the Plan.

5.      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case, including, but not limited to, the Bank Litigation and the Best/L.T. Falwell Litigation.

6.      enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other

agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order.

7.    hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan.

8.    consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order.

9.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order.

10.    enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated.

11.    hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order.

12.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case.

13.    except as otherwise limited in the Plan, recover all assets of the Debtor and property of the Debtor's Estate, wherever located.

14.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

15.    hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge.

16.    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code.

17.    enter a final decree closing the Chapter 11 Case.

## IX.    TAX CONSEQUENCES

The Debtor has not researched the federal income tax consequences of the Plan to holders of Claims based upon the Internal Revenue Code. The Debtor has not requested a ruling from the Internal Revenue Service with respect to these matters. Accordingly, no assurance can be given as to the interpretation of the IRS. Further, the federal income tax consequences to any particular creditor or interest holder may be affected by matters not discussed herein. There also may be

state, local or foreign tax considerations applicable to each creditor or holder of an interest. **EACH CLAIM AND INTEREST HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN AND THE FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.**

## CONCLUSION

THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ITS CREDITORS AND ITS ESTATE. THE PLAN PROVIDES FOR AN EQUITABLE AND EARLY DISTRIBUTION TO CREDITORS. THE DEBTOR BELIEVES THAT ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN COULD RESULT IN SIGNIFICANT DELAYS, LITIGATION AND COSTS. MOREOVER, THE DEBTOR BELIEVES THAT ITS CREDITORS WILL RECEIVE GREATER AND EARLIER RECOVERIES UNDER THE PLAN THAN THOSE THAT WOULD BE ACHIEVED IN A CHAPTER 7 LIQUIDATION. FOR THESE REASONS THE DEBTOR URGES HOLDERS OF THE CLAIMS IN THE IMPAIRED CLASSES TO RETURN A BALLOT ACCEPTING THE PLAN.

Dated:    New York, New York
          October 5, 2005

                                        LIBERTY VILLAGE ASSOCIATES LIMITED
                                        PARTNERSHIP

                                        By: *Jacob A. Frydman*
                                              Jacob A. Frydman
                                              President, Savoy Senior Housing Corp.
                                              General Partner


                                        ARENT FOX PLLC
                                        *Attorneys for the Debtor*

                                        By: *Robert E. Grossman*
                                              Robert E. Grossman (RG-3602)
                                              Beth Green Kibel (BG-1826)
                                              1675 Broadway
                                              New York, NY 10019
                                              Phone: 212-484-3915
                                              Fax: 212 484 3990

NYC/227222.5                              35