Exhibit 2

OPERATING AGREEMENT

OF

AMERICAN HERITAGE COMMUNITIES/LIBERTY VILLAGE, LLC

July 14, 2006

TABLE OF CONTENTS

PAGE

SECTION 1   ORGANIZATIONAL MATTERS
    1.01    Formation                                                          1
    1.02    Name                                                              1
    1.03    Principal Office                                                   1
    1.04    Purpose                                                            1
    1.05    Certificate of Formation; Filings                                  1
    1.06    Fictitious Name Statements; Qualification in Other States          2
    1.07    Registered Office and Registered Agent                             2
    1.08    Term                                                               2

SECTION 2   DEFINITIONS                                                        2

SECTION 3   MEMBERS                                                            7
    3.01    Names and Addresses                                                7

SECTION 4   MANAGEMENT
    4.01    Managers                                                           7
    4.02    General Powers of the Managers                                     7
    4.03    Tenure                                                             7
    4.04    Removal; Vacancy                                                   9
    4.05    Compensation                                                       9
    4.06    Power of Attorney                                                  9
    4.07    Managers Have No Exclusive Duty to Company                         9

SECTION 5   LIMITATION OF LIABILITY; INDEMNIFICATION                          10
    5.01    Limitation of Liability of Managers                               10
    5.02    Indemnity of Managers                                             10
    5.03    No Personal Liability to Members                                  12

SECTION 6   MEETINGS OF MEMBERS                                               12
    6.01    Meetings                                                          12
    6.02    Place of Meetings                                                 12
    6.03    Notice of Meetings                                                12
    6.04    Meeting of all Members                                            13
    6.05    Record Date                                                       12
    6.06    Quorum                                                            12
    6.07    Proxies                                                           13
    6.08    Action by Consent                                                 13
    6.09    Meetings by Telephone or Similar Communications                   13
    6.10    Waiver of Notice                                                  13

SECTION 7    VOTING UNITS; MEMBER VOTING                                          13
     7.01    Voting Units......                                                   13
     7.02    Voting Generally                                                     14


SECTION 8    CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS.                    14
     8.01    Members' Capital Contributions                                       14
     8.02    Capital Accounts... ............. ........ .........                  14
     8.03    Interest and Return of Capital Contribution.                          14
     8.04    Effect of Sale or Exchange                                           15


SECTION 9    DISTRIBUTIONS. ALLOCATIONS. ELECTIONS AND REPORTS                    15
     9.01    Distributions. ... ...    ..                                         15
     9.02    Allocations Generally                                                16
     9.03    Special Allocations..                                                16
     9.04    Curative Allocations ...                                             18
     9.05    Other Allocation Rules...... .... ........  .                        18
     9.06    Tax Allocations: Code Section 704(c)                                 19
     9.07    Allocation of Recapture......                                        19
     9.08    Returns and Other Elections                                          19
     9.09    Tax Matters Manager                                                  19


SECTION 10   TRANSFER OF MEMBERSHIP INTEREST                                      20
     10.01   Transfer Generally . ... ........ . ....... ....... . .. .. ..... .. .. ... ...  20
     10.02   Rights of Successor in Interest; Admittance as Substitute Member.    21
     10.03   Requirements for Substitute Members.                                 22
     10.04   Tax Reporting ....... .. ....... ...                                 22
     10.05   Admission of New Member..                                            22
     10.06   Allocations to New Members                                           21
     10.07   Redemption                                                           22


SECTION 11   DISSOLUTION AND TERMINATION                                          23
     11.01   Events of Dissolution.                                               23
     11.02   Liquidation... ..... ..                                              24
     11.03   Orderly Liquidation                                                  24
     11.04   Distributions.... . . ...                                           24
     11.05   Taxable Gain or Loss.......                                          25
     11.06   Certificate of Cancellation                                          25


SECTION 12   NOTICES .......                                                      25
     12.01   Form; Delivery                                                       25
     12.02   Waiver   .                                                           26


SECTION 13   DUTIES OF THE MEMBERS AND THEIR AFFILIATES                           24
     13.01                                                                        24
     13.02                                                                        25
     13.03                                                                        25

ii

SECTION 14  MISCELLANEOUS PROVISIONS ........................................ 27
  14.01  Bank Accounts................................................ 28
  14.02  Books of Account and Records ................... 28
  14.03  Application of Virginia Law ..................... 28
  14.04  Amendments ................................................ 28
  14.05  Execution of Additional Instruments ..... 28
  14.06  Construction ............................................... 28
  14.07  Headings ..................................................... 28
  14.08  Waivers ....................................................... 28
  14.09  Rights and Remedies Cumulative ........... 28
  14.10  Severability ................................................ 29
  14.11  Heirs, Successors and Assigns ................ 29
  14.12  Creditors...................................................... 29
  14.13  Counterparts ............................................... 29
  14.14  Entire Agreement ...................................... 29

OPERATING AGREEMENT
OF
AMERICAN HERITAGE COMMUNITIES/LIBERTY VILLAGE, LLC

THIS OPERATING AGREEMENT, is made and entered into as of July 14, 2006, by and between Liberty University, a Virginia non stock corporation (hereafter the "University"), and Liberty Heritage Associates, Inc., a Virginia corporation (hereafter 'Heritage"), who agree as follows:

## SECTION I
## ORGANIZATIONAL MATTERS

1.01    Formation. The Company was formed as a Virginia limited liability company under the Act on June 2, 2005 The rights and obligations of the Members shall be as provided in the Act, except as otherwise expressly provided herein In the event of any inconsistency between any terms and conditions contained in this Agreement and any non-mandatory provisions of the Act, the terms and conditions contained in this Agreement shall govern and in the event of any inconsistency between any items and conditions contained in this Agreement and any mandatory provisions of the Act, the terms and conditions of the Act shall govern

1.02    Name.    The name of the Company shall be American Heritage Communities/Liberty Village, LLC

1.03    Principal Office. The principal office of the Company is 1971 University Blvd, Lynchburg, Virginia 24502, or such other place as the Managers may from time to time designate. The Company may have other offices at any place or places as may be determined by the Managers.

1.04    Purpose. The primary purpose of the Company shall be to own and develop real property located in Lynchburg, Virginia commonly known as Liberty Village (the "Property") for a senior retirement community (the "Project") The Company may engage in any and all other lawful activities as may be necessary, incidental or convenient to carrying out the business of the Company as contemplated by this Agreement    The Company may also pursue any other lawful activity that is approved by the Members

1.05    Certificate of Formation; Filings. The Company executed and filed Articles of Organization with the Virginia State Corporation Commission as required by the Act    Any Manager may execute and file any amendments to the Articles of Organization authorized by the Members from time to time in a form prescribed by the Act    Any Manager also shall cause to be made, on behalf of the Company, such additional filings and recordings as the Manager shall deem necessary or advisable

1 06    **Fictitious Business Name Statements; Qualification in Other States.**
Following the execution of this Agreement, fictitious business name statements and
qualifications in various states may be filed and published as deemed necessary by the Manager

1.07    **Registered Office and Registered Agent.** The Company shall continuously
maintain a registered office and a designated and duly qualified agent for service of process on
the Company in the Commonwealth of Virginia. As of the date of this Agreement, the address of
the Company's registered office is 11 South 12th Street. P O Box 1463, Richmond, Virginia
23218, and its registered agent is Corporation Service Company The registered office and
registered agent may be changed from time to time by action of the Members

1.08    **Term** The Company commenced on June 2, 2005, and shall continue until
terminated pursuant to this Agreement

## SECTION 2
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings
(unless otherwise expressly provided herein):

1) –

(a)    "Act" shall mean the Virginia Limited Liability Company Act. Va.    Code
Section 13 1-1000 et seq . as amended and in force from time to time

(b)    "Additional Member" shall mean any Person who, after the execution of this
Operating Agreement, pursuant to Section 10.06. is issued a Membership Interest by the Company
in exchange for a Capital Contribution

(c)    "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit
balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other
period after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts that such Member is obligated
to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to
the next to the last sentences of Regulations Sections 1 704-2(g)(1) and 1 704-2(i)(5); and

(ii)    Debit to such Capital Account the items described in regulations Sections
1 704-2(b)(2)(ii)(*d*)(*4*). 1 704-2(b)(2)(ii)(*d*)(*5*). 1 704-2(b)(2)(ii)(*d*)(*6*).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with
the provisions of Regulations Section 1 704-1(b)(2)(ii)(*d*) and shall be interpreted consistently
therewith.                                                                                   ⟨ unreadable ⟩

(d)    "Affiliate" means, with respect to any Member, Manager or employee of the
Company. any Person that directly or indirectly through one or more intermediaries, controls, or is
controlled by, or is under common control with, such Member, Manager or employee and shall

2

include any relative or spouse of such Member. Manager or employee or any relative of such Member's, Manager's or employee's spouse. As used in the foregoing sentence, the term "control" means possession, directly or indirectly, of the power to direct or cause a direction of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise

(e)    "Articles" shall mean the Articles of Organization of the Company as filed and amended with the State Corporation Commission of Virginia from time to time

(f)    "Capital Account" as of any given date shall mean the account calculated and maintained by the Company for each Member as specified in Section 8

(g)    "Capital Contribution" shall mean any contribution to the capital of the Company by a Member in cash, property or services, or a binding obligation to contribute cash, property or services, whenever made

(h)    "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent superseding federal revenue laws

(i)    "Company" shall mean American Heritage Communities/Liberty Village, LLC, a Virginia limited liability company, as set forth in the Certificate of Organization issued by the Virginia State Corporation Commission on June 2, 2005

(j)    "Company Minimum Gain" shall have the meaning set forth in Regulations Section 1 704-2(b)(2) and 1 704-2(d) with respect to partnership minimum gain

(k)    "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

(l)    "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or other association.

(m)    "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year

(n)    "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

3

(i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Managers;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managers, as of the following times: (A) the acquisition of an additional interest in the Company following its initial capitalization by any new or existing Member in exchange for more than a de minimus Capital Contribution or in exchange for services; (B) the distribution by the Company to a Member of more than a de minimus amount of Company property as consideration for an interest in the Company; and (C) the liquidation of the Company within the meaning of Regulations Section 1 704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (A) and (B) above shall be made only if the Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by such Member and the Manager; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1 704-1(b)(2)(iv)(m) and Section 2(aa)(iv) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Managers determine that an adjustment pursuant to subparagraph (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv)

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses

(o)    "Manager" shall mean a manager as defined in the Act and as specified in Section 4

(p)    "Member" shall mean each of the parties who executes a counterpart of this Agreement as a Member and each of the parties who may hereafter become an Additional Member or a Substitute Member pursuant to the terms hereof, so long as any such party continues to hold a Membership Interest

(q)    "Membership Interest" shall mean the percentage interest in the Company of a Member (or a Successor in Interest thereof) set forth on Schedule 1 amended from time to time, including all of the rights, privileges and obligations of the Member relating to his status as a Member (or Successor in Interest in the Company)

4

(r)     "Member Nonrecourse Debt" shall have the meaning set forth in Regulations Section 1 704-2(b)(4) with respect to partner nonrecourse debt

(s)     "Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt. equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability. determined in accordance with Section 1 704-2(i)(3) of the Regulations

(t)     "Member Nonrecourse Deductions" has the meaning set forth in Regulations Sections 1 704-2(i)(1) and 1 704-2(i)(2) with respect to partner nonrecourse deductions

(u)     Net Cash Flow" shall mean, with respect to any fiscal period, all cash receipts during such fiscal period not used for capital expenditures and not considered as Net Cash Flow in a prior fiscal period and any amount theretofore held in any reserve that was not considered as part of Net Cash Flow in a prior fiscal period which the Managers determine need not be held any longer in reserve, all determined in accordance with the Company's method of accounting. less Operating Expenses

(v)     "Nonrecourse Deductions" shall have the meaning set forth in Sections 1 704-2(b)(1) and 1 704-2(c) of the Regulations

(w)     "Nonrecourse Liability" shall have the meaning set forth in Section 1 704-2(b)(3) of the Regulations

(x)     "Operating Agreement" or "Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time

(y)     "Operating Expenses" shall mean, with respect to any fiscal period, (i) to the extent paid other than with cash withdrawn from reserves, the amount of cash disbursed in such period in order to operate the Company and to pay expenses (including, without limitation, wages, taxes, insurance, repairs, and/or other costs and expenses) incident to the ownership or operation of the Property or the Company and (ii) amounts added to reserves as determined by the Managers

(z)     "Person" shall mean any natural person or Entity, and the heirs, executors, administrators. legal representatives, successors and assigns of such Person where the context so permits.

(aa)    "Profits" and "Losses" means, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss). with the following adjustments:

5

           (i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

           (ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

           (iii)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

           (iv)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

           (v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year, computed in accordance with the definition of "Depreciation";

           (vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)( *f*) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

           (vii)     Notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated pursuant to Section 9.03 or Section 9.04 shall not be taken into account in computing Profits or Losses

     The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 9.03 and 9.04 shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

     (bb)     "Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

     (cc)     "Substitute Member" shall mean a Successor in Interest who is admitted to the Company as a Member pursuant to Sections 10.03 and 10.04

(dd)    "Successor in Interest" means a Person other than a Member who is an assignee, transferee, successor or legatee of, or who otherwise succeeds to an ownership interest in, all or any portion of a Member's Membership Interest and who has not been admitted as a Substitute Member

(ee)    "Voting Unit" means the measure of the rights of a Member of the Company, pursuant to the provisions of this Agreement, to participate in the management and affairs of the Company and to vote on Company matters. The number of Voting Units possessed by a Member is determined in accordance with Section 7 hereof. Each Member's Voting Units are set forth on Schedule I hereto, as it may be amended from time to time.

## SECTION 3
## MEMBERS

3.01    Names and Addresses.   The names and mailing addresses of all Members are set forth on Schedule I attached hereto, which shall be amended from time to time to reflect changes in the identity and/or addresses of the Members

## SECTION 4
## MANAGEMENT

4.01    Managers.    The Company shall be managed under the direction of at least 1 (one) and not more than 2 (two) Managers, who shall be called individually a "Manager," and collectively, the "Managers." The Managers shall be elected by the Members as provided in Section 4 04   The initial Managers of the Company shall be Robert Gibbs and Jerry Falwell, Jr., Esq

4.02    General Powers of the Managers

(a)    Except as otherwise limited in this Operating Agreement, the Managers shall have exclusive right to manage the Company and to make all decisions regarding the business of the Company   The Managers shall carry out the policies, directions, orders and resolutions of the Members in the manner described in this Operating Agreement and as authorized and directed by the Members from time to time.  To the extent not inconsistent with the Act, the Articles or the express provisions of this Operating Agreement, all of the Managers shall have the same rights, powers and authority with respect to the Company   The Managers may delegate prescribed functions to any employee, agent or consultant

(b)    The Managers are granted the right, power and authority to do in the name of, and on behalf of, the Company all things that, in his sole judgment, are necessary, proper or desirable to carry out the purposes of the Company, including, but not limited to, the right, power and authority to:

7

(i)     Enter into, make and perform contracts, agreements and other undertakings binding the Company that may be necessary. appropriate or advisable in furtherance of the purposes of the Company

(ii)    Open and maintain bank accounts, investment accounts and other arrangements, draw checks and other orders for the payment of money, and designate individuals with authority to sign or give instructions with respect to those accounts and arrangements; provided. that Company funds shall not be commingled with funds from other sources and shall be used solely for the benefit of the Company

(iii)   Collect funds due to the Company

(iv)    Acquire, utilize for the Company's purposes. maintain and dispose of any assets of the Company

(v)     Pay debts and obligations of the Company. to the extent that funds of the Company are available therefor

(vi)    Borrow money or otherwise commit the credit of the Company for Company activities. and voluntarily prepay or extend any such borrowings

(vii)   Employ from time to time persons, firms or corporations for the operation and management of the Company, including, without limitation, managing agents, contractors, subcontractors, architects, engineers. laborers, supplies, accountants and attorneys, on such terms and for such compensation as the Managers shall determine, notwithstanding the fact that the Managers or any Member may have a financial interest in such firms or corporations

(viii)  Make elections available to the Company under the Code

(ix)    Register the Company as a tax shelter with the Internal Revenue Service and furnish to the Internal Revenue Service lists of investors in the Company. if required. pursuant to applicable provisions of the Code

(x)     Obtain general liability. property and other insurance for the Company. as the Managers deems proper

(xi)    Take such actions as may be directed by the Members in furtherance of their approval of any matter set forth in Section 4 hereof.

(xii)   Do and perform all such things and execute, acknowledge and deliver any and all such instruments as may be in)furtherance of the Company's purposes and necessary and appropriate to the conduct of its business

(c)     The Managers may delegate to one (1) or more of their number the authority to execute any documents or take any other actions deemed necessary or desirable in

8

furtherance of any action that they have authorized on behalf of the Company as provided in Section 4 hereof. Unless otherwise expressly provided by the Act. the Articles, or the terms of this Operating Agreement, the vote, approval or consent of a majority of the Managers, determined on a per capita basis. shall be necessary and sufficient for the Managers to take any action on behalf of the Company that the Managers are authorized to take pursuant to the Act. the Articles or this Operating Agreement

(d)     All actions taken by the Managers on behalf of the Company from the date of its organization to the execution of this Agreement are ratified and confirmed

4.03     Tenure. A Manager shall hold office until his death. resignation. disqualification or removal

4.04     Removal; Vacancy. A Manager may be removed at any time by the vote of Members holding at least seventy-five percent (75%) of the Voting Units entitled to vote when, in their judgment, the best interests of the Company will be served thereby Such removal shall be without prejudice to the contractual rights, if any, of the person so removed Any vacancy created or caused by removal, death, resignation or disqualification shall be filled by the vote of Members holding at least seventy-five percent (75%) of the Voting Units entitled to vote

4.05     Compensation The compensation. if any, of the Managers shall be fixed from time to time by the Members The Managers shall be entitled to reimbursement for expenses incurred by them in performing their duties, according to the policies set by the Members from time to time. Any amount paid as compensation to a Manager who is also a Member shall be treated as a guaranteed payment in accordance with Code Section 707(c).

4.06     Power of Attorney

(a)     Each Member does hereby irrevocably constitute and appoint the Managers serving in office from time to time, and each of them, as the Company's true and lawful attorney-in-fact, with full power and authority in their or its name, place and stead. to make, execute, consent to. swear to. acknowledge, record and file from time to time any and all of the following:

(i)     Any certificate or other instrument that may be required to be filed by the Company or the Members under the laws of the Commonwealth of Virginia or under the applicable laws of any other jurisdiction to the extent the Managers deem any such filing to be necessary or desirable;

(ii)     Any instrument or document which may be required to effect the continuation of the Company, the admission of an Additional or Substitute Member, or the dissolution and termination of the Company pursuant to the provisions of this Operating Agreement; and

(iii)     Any agreement, instrument, lease, deed, deed of trust, promissory note, certificate or other document in the name or on behalf of the Company which is necessary

9

or appropriate to implement, effectuate or otherwise carry out any transaction to which the Company is a party or to which the Company or any of its assets is or may be subject, provided such transaction has been approved by the Managers or the Members, as the case may be, in accordance with the provisions of this Operating Agreement

        (b)    The appointment by each Member of the Managers of the Company as his attorneys-in-fact is irrevocable and shall be deemed to be a power coupled with an interest and shall survive the disability, incompetence, bankruptcy, death or dissolution of any Person given such power, except, that in the event of an assignment by a Member of all or any part of his Membership Interest, this power of attorney shall survive such assignment only until such time, if any, as the successor in interest shall have been admitted to the Company as a Substitute Member and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution

    4.07    Unless otherwise expressly provided hereunder or under any other agreement entered into between the Company and such person, no Manager shall be required to manage the Company as his sole and exclusive function, and he may have other interests and activities in addition to those relating to the Company, and neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of such Manager or to the income or proceeds derived therefrom

## SECTION 5
## LIMITATION OF LIABILITY; INDEMNIFICATION

    5.01    Limitation of Liability of Managers.  In any proceeding brought by or in the right of the Company or brought by or on behalf of Members of the Company, a Manager (in his capacity as a Manager) or any of its Affiliates shall not be liable to the Company or its Members for any monetary damages arising out of any transaction, occurrence or course of conduct, unless in such proceeding the Manager or any of its Affiliates was adjudged to have engaged in willful misconduct or a knowing violation of the criminal law

    5.02    Indemnity of Managers.  The Managers shall be indemnified by the Company under the following circumstances and in the manner and to the extent indicated:

        (a)    Every Person, and his heirs, executors and administrators, who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding of any kind, whether civil, criminal, administrative, arbitrative or investigative, or was or is the subject of any claim, and whether or not by or in the right of the Company, by reason of his being or having been a Manager, or by reason of his serving or having served at the request of the Company as a director, officer, manager, employee or agent of another Entity, or at the request of the Company in any capacity that under Federal law regulating employee benefit plans would or might constitute him a fiduciary with respect to any such plan, whether or not such plan is or was for employees of the Company, shall be indemnified by the Company against expenses (including attorneys' fees), judgments, fines, penalties, awards, costs, amounts paid in settlement and liabilities of all kinds, actually and reasonably incurred by him in connection with, or resulting from, such action, suit, proceeding or claim, if he acted in good faith and in the

manner he reasonably believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful, provided that no indemnification shall be made in respect of any claim, issue or matter as to which he shall have been adjudicated to be liable to the Company for wilful misconduct or a knowing violation of the criminal law in the performance of his duty to the Company unless, and only to the extent, that the court in which such action, suit or proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, he is fairly and reasonably entitled to indemnity  The termination of any such action, suit or proceeding by judgment, order or conviction, or upon a plea of nolo contendere or its equivalent, or by settlement, shall not of itself create a presumption that any such Person did not act in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Company

(b)     Any indemnification under Section 5 02(a) (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of such Person is proper in the circumstances because the Manager had met the applicable standard of conduct set forth in such paragraph  Such determination may be made either (i) by the Managers by a majority vote of a quorum consisting of Managers who were not a party to such action, suit or proceeding, or (ii) if such a quorum is not obtainable or, even if obtainable, if a quorum of disinterested Managers so directs, by independent legal counsel in a written opinion, or (iii) by a majority of the Voting Units held by those Members who were not a party to such action, suit or proceeding

(c)     Reasonable expenses (including attorneys' fees) incurred by or in respect of any such Person in connection with any such action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, shall be paid by the Company in advance of the final disposition thereof upon receipt of an undertaking by, or on behalf of, such Person to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Company

(d)     The Managers of the Company shall have the power, generally and in specific cases, to indemnify their employees and agents to the same extent as provided in this Section with respect to its Managers

(e)     The provisions of this Section 5 are in addition to, and not in substitution for, any other right to indemnity to which any Person who is or may be indemnified by or pursuant to this Section may otherwise be entitled, and to the powers otherwise accorded by law to the Company to indemnify any such Person and to purchase and maintain insurance on behalf of any such Person against any liability asserted against or incurred by him in any capacity referred to in this Section or arising from his status as serving or having served in any such capacity (whether or not the Company would have the power to indemnify against such liability).

(f)     If any provision of this Section 5 shall be adjudicated invalid or unenforceable, such adjudication shall not be deemed to invalidate or otherwise affect any other provision hereof or any power of indemnity which the Company may have under the laws of the Commonwealth of Virginia

11

(g)    No amendment or repeal of this Section 5 shall limit or eliminate the right to indemnification provided hereunder with respect to acts or omissions occurring prior to such amendment or repeal

5.03    **No Personal Liability to Members.** Notwithstanding any provision of Section 5 02 above, the indemnification provided in Section 5.02 shall in no event cause the Members to incur any liability to the Company beyond their total Capital Contributions plus their share of any undistributed profits of the Company, nor shall it result in any liability of the Members to any third party

## SECTION 6
## MEETINGS OF MEMBERS

6 01    **Meetings**    Meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by a majority of the Managers or any Member or combination of Members holding at least twenty five (25%) of the Voting Units

6.02    **Place of Meetings**    The Managers may designate any place, within or outside of the Commonwealth of Virginia, as the place of meeting for any meeting of the Members. If no designation is made, the place of meeting shall be the principal office of the Company

6 03    **Notice of Meetings**    Except as provided in Section 6 04, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than sixty (60) days before the date of the meeting by or at the direction of the Managers or Person calling the meeting, to each Member entitled to vote at such meeting

6.04    **Meeting of all Members**    If the Members holding all the Voting Units shall meet at any time and place, either within or outside of the Commonwealth of Virginia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken

6.05    **Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution or taking such other action is adopted, as the case may be, shall be the record date for such determination of Members    When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 6 05, such determination shall apply to any adjournment thereof.

६.प्लांद

6.06    **Quorum**    Members holding at least seventy-five percent (75%) of all Voting Units entitled to vote at a meeting of the Members, represented in person or by proxy, shall constitute a quorum at any meeting of Members    In the absence of a quorum at any such meeting, a majority of the Voting Units so represented may adjourn the meeting from time to time for a

period not to exceed sixty (60) days without further notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.   At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.

6.07    Proxies  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

6.08    Action by Consent.  Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if one or more written consents to such action are signed by Members holding such number of Voting Units as are required to approve the action or matter described in the consent and such consent or consents are filed with the minutes of the proceedings of the Members.  Action taken under this Section 6.08 is effective when the requisite number of Members entitled to vote have signed the consent or consents, unless the consent or consents specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.  A copy of any such action taken pursuant to this Section 6.08 shall be delivered to each Member pursuant to the provisions of Section 12.01.

6.09    Meetings by Telephone or Similar Communications.  The Members may participate in a meeting by means of a conference telephone or similar communications equipment by means of which all Members participating in the meeting can hear each other at the same time, and participation by such means shall be conclusively deemed to constitute presence in person at such meeting.

6.10    Waiver of Notice.  When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

## SECTION 7
## VOTING UNITS; MEMBER VOTING

7.01    Voting Units.  Except as otherwise expressly provided hereunder, all matters on which votes are required hereunder shall be cast by Voting Units held by the Members. Each Voting Unit shall be entitled to one vote on all matters coming before any meeting of Members. The number of Voting Units held by each Member is set forth on Schedule I hereto. No new Voting Unit shall be awarded to any Person without consent of Members holding at least seventy-five percent (75%) of all Voting Units entitled to vote. Any transfer by a Member of some or all of its Membership Interest as permitted hereunder shall result in a proportionate reduction in the Voting Units held by the transferor and the transferee shall not be entitled to receive or hold any such Voting Units unless such Person is admitted as a Substitute Member with corresponding Voting Units pursuant to the provisions of Sections 10.03 and 10.04 hereof.  Changes in the

13

number of outstanding Voting Units shall be reflected on the books of the Company and may from time to time be reflected on revisions to Schedule 1. Each Member agrees and acknowledges that no Member shall be entitled to Voting Units unless such Member receives Voting Units in accordance with the terms and provisions of this Operating Agreement.

7.02    Voting Generally    The affirmative vote of Members holding a majority of all Voting Units represented in person or by proxy and entitled to be voted at a meeting shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, the Articles, or by the express provisions of this Agreement

## SECTION 8
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

### 8.01    Members' Capital Contributions

(a)    Initial Capital Contribution. Each initial Member shall make such Capital Contributions set forth on Schedule 1 attached hereto as his Initial Capital Contribution

(b)    Additional Capital Contributions    The Members shall not be required to make any further Capital Contributions beyond those set forth in Section 8.01(a) above without their prior consent.

(c)    Loans    The Managers may endeavor to obtain a loan or loans to the Company, from time to time, for necessary capital on reasonable terms, in order to finance the ownership and operation of the business of the Company

(d)    Loans to Company by Members. Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company in accordance with the terms of this Agreement

8.02    Capital Accounts    A separate Capital Account will be maintained for each Member in accordance with Code Section 704(b) and the Regulations thereunder. Without limiting the foregoing, the Capital Account of a Member shall be credited with the amount of all Capital Contributions by such Member to the Company. The Capital Account of a Member shall be increased by the amount of any Profits (or items of gross income) allocated to such Member pursuant to Section 9, and decreased by (i) the amount of any Losses (or items of loss or deduction) allocated to such Member pursuant to Section 9 and (ii) the amount of any cash or property (valued at its Gross Asset Value) distributed to such Member pursuant to Section 9.01 of this Agreement

8.03    Interest and Return of Capital Contribution. No Member shall receive any interest on his Capital Contribution. Except as otherwise specifically provided for herein, the Members shall not be allowed to withdraw or have refunded any Capital Contribution

14

8.04    Effect of Sale or Exchange. In the event of a permitted sale or exchange of a Membership Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest

## SECTION 9
## DISTRIBUTIONS, ALLOCATIONS, ELECTIONS AND REPORTS

### 9.01    Distributions.

(a)    All distributions of cash or other property, except distributions upon the Company's dissolution (which shall be governed by Section 11.04) and distributions pursuant to Section 10.07, shall be made to the Members on a pro rata basis in accordance with their respective Membership Interests on the record date of such distribution.

(b)    The Company shall distribute to the Members the amount necessary (as reasonably determined by the Managers) to cover the income taxes payable by the Members on income earned by the Company that is taxable to the Members, including allocations of income under Code Section 704(c), assuming each Member is in the highest combined individual federal, state and local tax bracket applicable to any Member (taking into consideration the character of the income with a proper adjustment for (i) the deductibility of state income taxes on federal income tax returns, and (ii) tax credits, capital gains and losses, and other specially allocated items which pass through to the Member). Distributions under this Section 9.01(b) shall be made when such taxes are due, including the payment of estimated taxes, and be netted against distributions made under Section 9.01(a)

(c)    The Managers shall have the right to determine how much Net Cash Flow, if any, of the Company shall be distributed among the Members each year  Such distributions of Net Cash Flow of the Company shall be distributed among the Members, pro rata in proportion to their respective Membership Interests.  The Managers shall have the right to establish, maintain and expend reserves to provide for working capital, future investments, debt service and such other purposes as the Managers deem necessary or advisable

(d)    Except as provided in Sections 9.01(b) and 11.04 hereof, all distributions of cash and property shall be made at such times and in such amounts as determined by the Managers

(e)    All other provisions hereof notwithstanding, the Company's obligation, and Managers' authority, to make any distribution is subject to the restrictions governing distributions under the Act and such other pertinent governmental restrictions as are now and may hereafter become effective.  Currently, among other prohibitions, the Act prohibits the Company from making a distribution to the extent that, after giving effect to the distribution, liabilities of the Company exceed the fair value of the assets of the Company  All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section 9

9 02    Allocations Generally  After giving effect to the special allocations set forth in Sections 9 03 and 9 04 hereof. Profits or Losses for any fiscal year shall be allocated in the following order and priority:

(a)    Except as provided in Section 9 02(b) below. Profits and Losses shall be allocated to and among the Members in proportion to the Membership Interest held by each Member

(b)    Losses allocated pursuant to Section 9.02(a) hereof shall not exceed the maximum amount of Losses that can be allocated without causing a Member to have an Adjusted Capital Account Deficit at the end of any fiscal year  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.02(a) hereof, the limitation set forth in this Section 9.02(b) shall be applied on a Member by Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Regulations Section 1 704-1(b)(2)(ii)(d)

9.03    Special Allocations.  The following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback  Notwithstanding any other provision of this Section 9, if there is a net decrease in Company Minimum Gain during any fiscal year, then except as otherwise provided in Regulations Section 1 704-2(f), each Member shall be specially allocated items of Company income and gain for such fiscal year (and. if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain during such fiscal year determined in accordance with Regulations Section 1 704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1 704-2(j)(2).  This Section 9.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1 704-2(f) of the Regulations and shall be interpreted consistently therewith

(b)    Member Nonrecourse Debt Minimum Gain Chargeback   Except as otherwise provided in Regulations Sections 1 704-2(f), notwithstanding any other provision of this Section 9, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt determined in accordance with Regulations Section 1 704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Person pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1 704-2(i)(4) and 1 704-

16

2(j)(2)   This Section 9.03(b) is intended to comply with the minimum gain chargeback requirement Regulations Section 1.704-2(f) and shall be interpreted consistently therewith

      (c)   Qualified Income Offset  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 9.03(c) shall only be made if, and only to the extent that, such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 9 have been tentatively made as if this Section 9.03(c) were not in the Agreement.

      (d)   Gross Income Allocation  In the event any Member has a deficit balance in his or her Capital Account at the end of any fiscal year of the Company that is in excess of the sum of (i) the amount such Member is obligated to restore (pursuant to the terms of this Agreement or otherwise) and (ii) the amount such Member is deemed to be obligated to restore pursuant to the next to last sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.03(d) shall be made if and only to the extent that such Person would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 9 have been tentatively made as if Section 9.03(c) hereof and this Section 9.03(d) were not in the Agreement

      (e)   Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interest

      (f)   Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.  Such allocations shall be made in accordance with, and in the manner set forth in, Regulations Section 1.704-2(i)(1)

      (g)   Section 754 Adjustment.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his or her interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their Membership Interests in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

      (h)   Allocations Related to Taxable Issuance of Membership Interests  Any income, gain, loss or deduction realized as a direct or indirect issuance of an interest in the

Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if the Issuance Items had not been realized

    9.04    **Curative Allocations.**    The allocations set forth in Sections 9 02(b), 9.03(a), 9 03(b), 9.03(c), 9 03(d), 9.03(e), 9.03(f) and 9.03(g) hereof (together the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations   It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 9 04   Therefore, notwithstanding any other provision of this Section 9 (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner determined by the Managers to be appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to the Sections of this Agreement other than the Regulatory Allocations and this Section   In exercising their discretion under this Section, the Managers shall take into account future Regulatory Allocations under Sections 9.03(a) and 9 03(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9 03(e) and 9 03(f)

    9.05    **Other Allocation Rules.**

    (a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managers using any permissible method under Code Section 706 and the Regulations thereunder

    (b)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members, in the same proportions as they share Profits or Losses, as the case may be, for the year

    (c)    The Members are aware of the income tax consequences of the allocations made by this Section 9 and hereby agree to be bound by the provisions of this Section 9 in reporting their shares of Company income and loss for income tax purposes

    (d)    Solely for the purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1 752-3(a)(3), the Members' interests in Company Profits are equal to the Members' Membership Interests     

    (e)    To the extent permitted by Sections 1 704-2(h)(2) and 1 704-2(h)(3) of the Regulations, the Manager shall endeavor to treat distributions as having been made from proceeds

of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member

9.06    Tax Allocations: Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with Section 2(n) hereof)

In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 2(n) hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder

Any elections or other decisions relating to such allocations shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Agreement    Allocations pursuant to this Section 9.06 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Agreement

9.07    Allocation of Recapture.  For purposes of determining the character (as ordinary income or capital gain) of any taxable income or gain of the Company allocated to the Members pursuant to this Section 9, such portion of the taxable income or gain of the Company allocated pursuant to this Section 9 which is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (a) the amount of depreciation previously allocated to each Member bears to (b) the total of such depreciation allocated to all Members.  This Section shall not alter the amount of allocations among the Members pursuant to Section 9 but merely the character of the income so allocated

9.08    Returns and Other Elections.  The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year

All elections permitted to be made by the Company under federal or state laws, including but not limited to any election under Code Section 754, shall be made by a majority of the number of Managers

9.09    Tax Matters Manager.  To the extent that such a designation is required pursuant to the Code or the Regulations, the parties hereto agree to the designation of University as the Tax Matters Manager of the Company who shall fulfill the role of a "tax matters partner" pursuant to

Code Section 6231 with full power and authority to act on behalf of the Company and the Members in such capacity

## SECTION 10
## TRANSFER OF MEMBERSHIP INTEREST

### 10.01   Transfer

      (a)   No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of his Membership Interest now owned or subsequently acquired by him, other than as provided for in this Section 10   No Member shall directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of its Membership Interest without the prior written consent of the non-transferring Members.   In addition to the limitation in the preceding sentence, Heritage's direct or indirect, transfer, sale, gift, encumbrance, assignment, pledge, or otherwise dealing with or disposal of all or any part of its Membership Interest shall be subject to Section 10(b) through (f) hereof while University continues to be a Member of the Company.   Any transfer in violation of and without full compliance with this Agreement shall be void ab initio and without legal effect   A Member's Voting Units may not be transferred, in whole or in part, to a Successor in Interest, another Member or any other Person except as specifically provided in Section 7.01 and this Section 10.

      (b)   For purposes hereof, a "Change of Control" shall mean (i) Heritage's disposition of assets requiring shareholder approval pursuant to Section 13 1-724 of the Virginia Stock Corporation Act; (ii) a merger requiring the approval of Heritage shareholders pursuant to Section 13 1-718 of the Virginia Stock Corporation Act; or (iii) any sale of stock, merger, consolidation, share exchange, reorganization, combination or other event, that results in the ownership by any person other than the Shareholders (as hereinafter defined) holding an ownership interest in Heritage; provided, however, a Change of Control shall not include the transfer of a Shareholder's stock in Heritage to a lineal descendant of such Shareholder in connection with the death of such Shareholder

      (c)   Heritage represents and warrants, covenants and agrees that as of the date hereof and throughout the period during which University is a Member of the Company (i) the Persons listed on Schedule 2 attached hereto and incorporated herein by reference (the "Shareholders") own all of the issued and outstanding shares in Heritage; (ii) that no Person other than the Shareholders owns any subscriptions, options, warrants, calls, commitments or agreements to issue any additional shares of capital stock or any other equity security of Heritage, and (iii) Jacob Frydman is not and will not be a Shareholder and does not and will not own, directly or indirectly, any subscriptions, options, warrants, calls, commitments or agreements to purchase any shares of capital stock or any other equity security of Heritage

      (d)   If one of the following events occurs without University's prior written approval (which shall be in University's sole and absolute discretion), it shall constitute an "Ownership Breach" hereunder:

        (i)      Heritage breaches any of the representations, warranties, covenants or agreements in Section 10.01(c).

        (ii)     Heritage, directly or indirectly, transfers, sells, gives, encumbers, assigns, pledges, or otherwise deal with or dispose of all or any part of its Membership Interest, or

        (iii)    a Change of Control of Heritage occurs

        (e)     In the event of an Ownership Breach, (i) University shall have no further obligations under Section 13 hereof and shall no longer be subject to the restrictive covenants under Section 13 hereof, (ii) the Company and the Members of the Company shall not use the name "Liberty University" or any variation thereof in any marketing or advertising efforts, or otherwise publicly suggest that University or any of its Affiliates has any affiliation whatsoever with the Property, the Project or the Company, and (iii) the Company and the Members of the Company shall not disclose to any third party University's Membership Interest in the Company unless required to do so by law

        (f)     Heritage understands and acknowledges that, in the event of an Ownership Breach, University has a legitimate business interest in preventing Heritage from taking any actions in violation of Section 10.01(e) subparagraphs (ii) and (iii) of this Agreement and that such provisions of this Agreement are intended to protect the business and goodwill of University and are a material inducement to University's execution of this Agreement and agreeing to become a member of the Company  Heritage further acknowledges that, where an Ownership Breach has occurred, a Section 10.01(e) subparagraphs (ii) and (iii) of this Agreement will irreparably and continually damage the University  Heritage agrees that if there is an Ownership Breach and, thereafter, Heritage violates Section 10.01(e) subparagraphs (ii) and (iii) of this Agreement, no remedy at law would be adequate  Accordingly, Heritage and University each agree that, in addition to any other remedy to which University may be entitled at law or in equity, if there is an Ownership Breach, University shall be entitled to a decree of specific performance to enforce Section 10.01(e) subparagraphs (ii) and (iii) of this Agreement (without bond or other security begin required unless the party seeking such remedy fails to demonstrate to an appropriate court having jurisdiction that such party has a likelihood of success on the merits), and Heritage waives the defense in any action or proceeding brought to enforce Section 10.01(e) subparagraphs (ii) and (iii) of this Agreement that there exists an adequate remedy at law.  In the event any lawsuit, claim or other proceeding is brought by University to enforce Section 10.01(e) of this Agreement, or to determine the validity of its terms, University will be entitled to recover from Heritage, if it prevails, its reasonable attorneys' fees and costs incurred in obtaining enforcement of, or determining the validity of, such provisions of this Agreement

      **10.02  Rights of Successor in Interest; Admittance as Substitute Member.**  No Successor in Interest of the whole or any portion of any Membership Interest of a Member shall have the right to participate in the management of the business and affairs of the Company or to hold any Voting Units, or to become a Substitute Member in place of his predecessor in interest with respect to the whole or any portion of said Membership Interest without the prior written consent of the Members holding at least seventy-five percent (75%) of all Voting Units (not taking

into account any Voting Units of the transferring Member), which consent shall be in the Members' respective sole discretion and be binding and conclusive on all parties. A Successor in Interest shall be bound by, and shall take such Membership Interest subject to, the terms and conditions of this Agreement as same applies to Members and their Membership Interests, but a Successor in Interest shall not have any Voting Units or any other rights or privileges of a Member hereunder other than to share in the allocations and distributions to which the transferor Member would be entitled in respect of the transferred Membership Interest unless and until such Successor in Interest is admitted as a Substitute Member in accordance with the provisions of this Section 10.02 and Section 10.03 hereof, which admittance may be with or without corresponding Voting Units.

10.03  Requirements for Substitute Members   As a condition to the admission as a Substitute Member with respect to the whole or any portion of a Membership Interest, a Successor in Interest shall execute and acknowledge such instruments in form and substance as the Managers may reasonably deem necessary or desirable to effect such admission and to confirm the agreement of such Person being admitted as a Substitute Member to be bound by all of the terms of this Operating Agreement, as the same may have been amended and then in force. Such Successor in Interest shall pay all reasonable expenses in connection with such admission as a Substitute Member.

10.04  Tax Reporting   Each Member agrees that if he transfers or assigns all or part of his Membership Interest herein, such Member shall keep a list containing the transferee's name, address, social security number or taxpayer identification number, as the case may be, the date on which such transfer occurred and the name, address and tax shelter registration number, if required to be obtained, of the Company.

10.05  Admission of New Member   With the consent of Members holding at least seventy-five percent (75%) of all Voting Units entitled to vote, any Person may become an Additional Member in the Company by the issuance of a new Membership Interest, with or without corresponding Voting Units, in consideration for such Capital Contribution as the Managers shall determine appropriate; provided, that such Person executes such instruments as the Managers deem necessary or desirable to effect its admission as a Member and to confirm its agreement to be bound by all the terms and conditions of this Operating Agreement.

10.06  Allocations to New Members   No Additional Member or Substitute Member or Successor in Interest shall be entitled to any retroactive allocation of items of taxable income, gain, loss, deductions or credits of the Company. The Managers may, at its option, at the time an Additional Member or Substitute Member is admitted, or a Successor in Interest receives a Membership Interest, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of income, gain, loss, deductions or credits to an Additional Member or Substitute Member or Successor in Interest for that portion of the Company's tax year in which an Additional Member or Substitute Member was admitted or Successor in Interest received his Membership Interest, in accordance with the provisions of Code Section 706(d) and the regulations promulgated thereunder.

10.07  Redemption   Commencing on October 1, 2006, the University shall have the right upon delivery of written request to the Company (the "Redemption Right"), to receive those

22

parcels of land comprising approximately 25 acres and commonly referred to as the Townhome Area as more particularly described on Exhibit A (the 'Redemption Property') in exchange for the Company's redemption of 75% of the University's 85% Membership Interest (the "Redemption Interest") such that the University shall have remaining a 10% interest in the Company. The parties acknowledge that the survey attached hereto as Exhibit A is a preliminary outline of the Redemption Property  At the time that the University exercises the Redemption Right, the boundaries of the Redemption Property may need to be modified to accommodate existing improvements in the vicinity of the Redemption Property  University, at its expense, shall have the proposed Redemption Property re-surveyed at that time and the exact boundaries of the Redemption Property shall be determined jointly by University and Heritage  The closing on the Redemption Property shall take place within thirty (30) days of University's written request to exercise its Redemption Right  The Company shall transfer the Redemption Property to University by special warranty deed (the 'Deed"), free and clear of (i) any declarations or restrictive covenants encumbering the Property, so long as Heritage (as declarant) has the authority to release the Redemption Property from such declaration or restrictive covenants, and (ii) all liens, security interests, claims, charges or encumbrances of any kind, but subject to (x) such other easements, agreements, conditions and restrictions applicable to the Redemption Property and recorded against the Redemption Property as of the date hereof, and (y) the lien of ad valorem real estate taxes not yet due and payable.  University shall pay for the costs to record the Deed  Notwithstanding the foregoing, if the University has not delivered notice to the Company that it is exercising its Redemption Right, the Company may redeem the Redemption Interest (i) by delivering notice of its intention to redeem to the University which shall request an invoice for Redemption Costs (as hereinafter defined) and the University's preferred method of payment; (ii) within five (5) days of the University designating its preferred method of payment, delivering to the University payment in the amount of the University's Capital Contribution by means of certified check or wire transfer of immediately available funds to an account designated by University; and (iii) within five (5) days upon delivery of an invoice by University, delivering payment in the amount of all costs and expenses (including, without limitation, reasonable fees and expenses of attorneys and accountants, surveyors, title insurance, appraisers, or similar service providers) incurred by University in connection with the negotiation of this Agreement and the transactions contemplated herein (the "Costs").  UNIVERSITY SHALL HAVE THE RIGHT TO APPROVE ANY TITLE DOCUMENTS RELATED TO THE PROPERTY AFTER THE DATE OF THE OPERATING AGREEMENT

## SECTION 11
## DISSOLUTION AND TERMINATION

11.01  Events of Dissolution  The Company shall be dissolved upon the occurrence of any of the following events:

(a)    The determination in writing of Members holding at least seventy-five percent (75%) of all Voting Units entitled to be voted;

(b)     The sale, transfer or assignment of substantially all of the assets of the Company;

(c)     The adjudication of the Company as insolvent within the meaning of insolvency in either bankruptcy or equity proceedings, or the filing of an involuntary petition in bankruptcy against the Company (which is not dismissed within ninety (90) days), or the filing against the Company of a petition for reorganization under the federal bankruptcy code or any state statute (which is not dismissed within ninety (90) days), or a general assignment by the Company for the benefit of creditors, or the voluntary claim (by the Company) that it is insolvent under any provisions of the federal bankruptcy code (or any state insolvency statutes), or the appointment for the Company of a temporary or permanent receiver, trustee, custodian or sequestrator, and such receiver, trustee, custodian or sequestrator is not dismissed within ninety (90) days; or

(d)     As otherwise required by Virginia law

11.02  **Liquidation**  Upon the dissolution of the Company, it shall wind up its affairs by either or a combination of both of the following methods as the Managers (or if there are no Managers, such Person or Persons elected by Members holding a majority of the Voting Units) shall in their sole discretion determine:

(a)     Selling the Company's assets and, after paying the Company's liabilities or reserving sufficient funds for such liabilities, distributing the net proceeds to the Members in satisfaction of their interests in the Company; and/or.

(b)     Distributing the Company's assets to the Members in kind with the Members accepting undivided interests in the Company's assets, subject to its liabilities, in satisfaction of their interests in the Company

11.03  **Orderly Liquidation.**  A reasonable time as determined by the Managers (or the Person or Persons carrying out the liquidation) not to exceed eighteen (18) months shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to the creditors so as to minimize any losses attendant upon dissolution

11 04  **Distributions.**  Upon dissolution, the Company's assets (including any cash on hand) shall be distributed in the following order and in accordance with the following priorities:

(a)     First, to the payment of the debts and liabilities of the Company (including but not limited to loans made by the Members or Managers) and the expenses of liquidation, including a sales commission to the selling agent, if any; then

(b)     Second, to the setting up of any reserves which the Managers (or the Person or Persons carrying out the liquidation) shall deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company  Said reserves shall be paid over to a bank or an attorney at law as escrow agent to be held for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies  At the expiration of such period

as the Managers (or the Person or Persons carrying out the liquidation) shall deem advisable, but in no event to exceed eighteen (18) months, the Managers shall distribute the balance thereof in the manner provided in the following subparagraph; then

(c)    Third, to the Members on a pro rata basis in accordance with their respective Capital Accounts after giving effect to all contributions, allocations and distributions for all periods

11.05  Taxable Gain or Loss.  Taxable income, gain and loss from the sale of the Company's property incurred upon or during liquidation and termination of the Company shall be allocated to the Members as provided in Section 9

11 06  Certificate of Cancellation

(a)    Within a reasonable time following the completion of the liquidation of the Company, there shall be supplied to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement.  Upon completion of the liquidation of the Company and the distribution of all the Company's assets, the Company shall terminate, and the Members shall execute and record a Certificate of Cancellation of the Company as well as any and all other documents required to effectuate the dissolution and termination of the Company

(b)    Upon the issuance of the filing of the Certificate of Cancellation, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act  The Managers shall thereafter be trustees for the Members and creditors of the Company and as such shall have authority to distribute any Company property discovered after dissolution, convey real estate, if any, and take such other action as may be necessary on behalf of and in the name of the Company

## SECTION 12
## NOTICES

12.01  Form; Delivery  Whenever, under the provisions of law, the Articles or this Operating Agreement, notice is required hereunder to be given to any Person, it shall not be construed to mean exclusively personal notice unless otherwise specifically provided, but such notice may be given in writing, by mail or by a generally recognized overnight courier service, addressed to such Person, at his post office and street address as it appears on the records of the Company, with postage or applicable delivery fees thereon prepaid or billed to the sender.  Any such notice shall be deemed to have been given at the time it is deposited, postage or applicable fees prepaid or billed to sender, in the United States mail or with such recognized courier service.  Notice may also be given by a form of electronic transmission consented to by the Person to whom the notice is given  Notice given by a form of electronic transmission shall be deemed to have been delivered at the time it is transmitted.  Any consent to notice by electronic transmission shall be revocable by written notice to the Company and shall be deemed revoked if (a) the Company is unable to deliver by electronic transmission two (2) consecutive notices given by the Company in

accordance with such consent and (b) such inability becomes known to the Managers or other person responsible for giving the notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or action.

12.02  **Waiver**  Whenever any notice is required to be given under the provisions of law, the Articles or this Operating Agreement, a written waiver thereof, signed by the Person or Persons entitled to such notice and filed with the records of the meeting, whether before or after the time stated therein, shall be conclusively deemed to be equivalent to such notice. In addition, any Member who attends a meeting of Members in person, or is represented at such meeting of proxy, without protesting at the commencement of the meeting the lack of notice thereof to him, or any Manager who attends a meeting of the Managers without protesting at the commencement of the meeting such lack of notice, shall be conclusively deemed to have waived notice of such meeting

## SECTION 13
## DUTIES OF THE MEMBERS AND THEIR AFFILIATES

13.01  Subject to the terms and conditions of this Agreement, University shall reasonably assist the Company in obtaining all necessary governmental approvals and permits for the construction of the Project, and shall cause TRBC Ministries, LLC ("TRBC") to provide reasonable initial advertising and marketing for the Project, including, without limitation, the production of commercials and infomercials to be aired at times mutually agreed upon by the Members throughout the development of the Project on the Liberty Broadcasting Network Notwithstanding anything herein to the contrary, in no event will University or any affiliate thereof be required to provide any guarantees or financial assurances of any kind, or agree to any conditions or restrictions of any kind whatsoever, in connection with the Project and/or the Company University and TRBC shall also undertake a reasonable direct mail campaign to be mutually designed by Heritage and University and TRBC, and shall place full page advertisements in each issue of the National Liberty Journal during and after construction No later than the date on which all zoning approvals for the Project are obtained, University and TRBC shall present an initial marketing budget ("Marketing Budget") to Heritage for its approval which shall not be unreasonably withheld, and which shall be deemed approved if not disapproved within ten (10) days after receipt by Heritage of same University and TRBC shall have no marketing or advertising obligations under this Section 13 until the Marketing Budget is approved as provided above. If University and Heritage are unable to agree on a commercially reasonable Marketing Budget within a reasonable time period, then University and TRBC shall have no marketing or advertising obligations under this Section 13 The Company shall implement the Marketing Budget and approve in advance any expenditures to be undertaken by University to the extent not in accordance with the Marketing Budget Subject to the other terms and conditions hereof, TRBC's obligations under this Section shall survive any redemption or transfer of University's Membership interest TRBC's and University's obligations under this Section 13.01 shall automatically terminate upon the earlier of the (i) date ten (10) years immediately following the date of this Agreement, and (ii) substantial completion of the Project

13.02  The Company shall pay all costs and expenses, including, without limitation, reasonable mailing, advertising, marketing, administrative, secretarial and out-of-pocket expenses, including, without limitation, legal and other professional fees, incurred by University

and TRBC in connection with the performance of their obligations pursuant to Section 13 01 Notwithstanding anything in this Agreement to the contrary, (i) the Company shall not make any distributions to any Member other than University (or its successor in interest, if any) until all amounts payable under this Section 13.02 have been paid in full, and (ii) the restrictions and obligations of University and TRBC under this Section 13 shall automatically terminate upon the Company's failure to pay all amounts as provided herein All amounts payable under this Section 13 02 remaining unpaid for thirty (30) days after request is made for such payment shall accrue interest at the base rate equal to the Citibank. N A. applicable rate on a 90-day loans to responsible and substantial commercial borrowers plus three percentage (3%) points per annum

13.03 Subject to the terms and conditions of this Agreement, TRBC and University hereby covenant and agree that, during the period commencing on the date hereof and continuing until August 1, 2016, unless action with the prior written consent of Heritage or unless the Company is sooner terminated, except in connection with the Company and/or the Project, they shall not (and shall not permit their Affiliates), directly or indirectly, to engage in the business of, or acquire or own, manage, cooperate, finance, join, control or participate in the acquisition or ownership. management, operation. financing or control of, or be connected as a principal. employee, officer, director, partner, independent contractor, investor, joint venture partner, agent, affiliate, representative, consultant or otherwise with, any business which is in the business of owning, operating, developing, constructing or managing a Senior Housing Community located within twenty five (25) miles of the City of Lynchburg. Virginia  The term Senior Housing Community means any part of the Project including, without limitation, an active adult community, retirement community, independent assisted living, skilled Alzheimer care, and continuing care retirement community The parties intend that the noncompete covenants set forth in this Section 13 03 shall be construed as separate covenants, one for each county and subdivision to which the covenant applies  In the event a court of competent jurisdiction determines that the provisions of this covenant not to compete are excessively broad as to duration, geographic scope or activity, it is expressly agreed that this covenant not to compete shall be construed so that the remaining provisions shall not be affected, but shall remain in full force and effect, and any such over broad provision shall be deemed, without further action on the part of any person, to be modified, amended and or limited, but only to the extent necessary to render the same valid and enforceable in such jurisdiction  Each of the parties hereto acknowledges and agrees that no remedy at law would be adequate in the event of any breach of this Section.  Accordingly, TRBC and University each agree that, in addition to any other remedy to which Company may be entitled at law or in equity, the other parties hereto shall be entitled to a decree of specific performance to enforce this Section (without bond or other security begin required unless the party seeking such remedy fails to demonstrate to an appropriate court having jurisdiction that such party has a likelihood of success on the merits), and TRBC and University waive the defense in any action or proceeding brought to enforce this Agreement that there exists an adequate remedy at law

## SECTION 14
## MISCELLANEOUS PROVISIONS

27

14.01  **Bank Accounts.**   The Company shall maintain such bank accounts as the Managers may determine to be appropriate from time to time

14.02  **Books of Account and Records.**   Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions and other matters relating to the Company in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company The books and records shall at all times be maintained at the principal office of the Company, which initially shall be located at 1971 University Blvd. Lynchburg, Virginia 24502, and shall be open to inspection and examination of the Members or their duly authorized representatives during reasonable business hours

14.03  **Application of Virginia Law.**   This Operating Agreement, and the interpretation hereof, shall be governed exclusively by its terms and by the laws of the Commonwealth of Virginia. without reference to its choice of law provisions, and specifically the Act

14.04  **Amendments**   Any amendment to this Operating Agreement may be proposed to the Members by the Managers or by Members holding at least seventy-five percent (75%) of the Voting Units in the Company   A vote on any amendment to this Operating Agreement shall be taken within thirty (30) days after notice thereof has been given to the Members unless such period is otherwise extended by applicable laws, regulations, or agreement of the Members.  A proposed amendment shall become effective at such time as it has been approved by Members holding at least seventy-five percent (75%) of all Voting Units entitled to be voted   The execution of an amended Operating Agreement by all Members shall be conclusive evidence of approval of such amended Operating Agreement

14.05  **Execution of Additional Instruments.**   Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments as necessary to comply with any laws. rules or regulations

14.06  **Construction**   Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa.

14.07  **Headings.**   The headings in this Agreement are inserted for convenience only and are in no way intended to describe. interpret. define, or limit the scope. extent or intent of this Operating Agreement or any provision hereof.

14.08  **Waivers**   The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation

14.09  **Rights and Remedies Cumulative.**   The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall

28

not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

14 10 **Severability**. If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law

14 11 **Heirs, Successors and Assigns**. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns

14 12 **Creditors**. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditor of the Company The specific intent of the undersigned is that there shall be no third-party beneficiaries of this Agreement

14 13 **Counterparts** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14 14 **Entire Agreement**. This Agreement sets forth all of the promises, agreements, conditions and understandings between the parties respecting the subject matter hereof and supersedes all negotiations, conversations, discussions, correspondence, memoranda and agreements between the parties concerning such subject matter

The undersigned, being all of the initial Members of the Company, hereby agree, acknowledge and certify that the foregoing Operating Agreement, including the schedules and exhibits hereto, constitutes the sole and entire Operating Agreement of American Heritage Communities/Liberty Village, LLC adopted as of the date first written above

MEMBERS:

Liberty University

By: _Jerry Falwell_
Name: JERRY FALWELL
Title: PRESIDENT

Liberty Heritage Associates, Inc.

By: _____
Name: _____
Title: _____

ACKNOWLEDGED and AGREED
As to Section 13 only
TRBC Ministries, LLC

By: _____
Name: Ronald S. Godwin
Title: President/Manager

LIST OF SCHEDULES AND EXHIBITS:

Schedule 1 -    Members' Names, Addresses, Membership Interests. Voting Units
                and Initial Capital Contributions
Schedule 2 -    Heritage Shareholders

Exhibit A -     Townhome Area Description

13311-4

30

07/14/2008 18:15 FAX  18734250161          McELROY DEUTSCH MULVANEY                    @038/041

The undersigned, being all of the initial Members of the Company, hereby agree, acknowledge and certify that the foregoing Operating Agreement, including the schedules and exhibits hereto, constitutes the sole and entire Operating Agreement of American Heritage Communities/Liberty Village, LLC, adopted as of the date first written above.

MEMBERS:

Liberty University

By: _____
Name: _____
Title: _____


Liberty Heritage Associates, Inc.

By: _____
Name: _A. RON T. L. BRESS_
Title: _PRESIDENT_


ACKNOWLEDGED and AGREED
As to Section 13 only
TRBC Ministries, LLC


By: _____
   Name: _____
   Title: _____


LIST OF SCHEDULES AND EXHIBITS:

Schedule 1 -       Members' Names, Addresses, Membership Interests, Voting Units
                   and Initial Capital Contributions
Schedule 2 -       Heritage Shareholders

Exhibit A -        Townhome Area Description

## SCHEDULE I

### Members' Names, Addresses, Membership Interests, Voting Units and Initial Capital Contributions

| Name and Address | Membership Interest | Voting Units | Initial Capital Contributions |
|---|---|---|---|
| Liberty University 1971 University Blvd Lynchburg, Virginia 24502 | Eighty Five (85) percent | Eighty Five (85) | $2,250,000 |
| Liberty Heritage Associates, Inc. 3 College Avenue, Suite 3, Frederick, Maryland 21701 | Fifteen (15) percent | Fifteen (15) | $750,000 |
| | | | |
| | | | |
| TOTAL. | 100% | 100 | |

## SCHEDULE 2

### Heritage Shareholders

BRUCE BOYER
HERBERT KAISER
ROBERT V GIBBS
DOUGLAS CAMERON
ROBERT KEATING
CHRIS GUIDI
LARS ENSTROM
LAWRENCE MURPHY
DEAN MUNLEY
KRISTIN KUTAC

32

## EXHIBIT A

## TOWNHOME AREA DESCRIPTION



33